Zohrlaut, Appellant, vs. Mengelberg, Respondent.

*November 17, 1909—January 11, 1910.*
*October 29, 1910—January 31, 1911.*

*Contracts: Construction: Corporations: Sale of shares: Appeal: Affirmance on equal division of justices: Judgment: Opening case for further defense.*

Plaintiff agreed in writing to sell to defendant on November 30, 1899, "twenty-five shares of the five hundred shares of the capital stock" of a corporation at the book value at that date, payment to be secured by defendant's notes with the stock as collateral, and that if at any time defendant should cease to be a director and officer of the corporation plaintiff would repurchase said twenty-five shares at the book value at the time of repurchase, deducting any amount unpaid on the notes. Five hundred shares were then outstanding, of the par value of $1,000 each, being the full authorized capital stock of the company. Afterwards a certificate for 174 shares was canceled, so that the outstanding capital stock was $326,000. On November 30 the books showed that on the basis of $500,000 the shares were worth about ten or twelve per cent. above par, and on the basis of $326,000 were worth about forty or fifty per cent. above par. Thereafter the parties made a new contract by which plaintiff agreed to employ defendant at a salary for five years as a director and officer of the company and, "in accordance with the terms of the" previous agreement, to sell to defendant twenty-five shares of the capital stock of the company at par, accepting defendant's note in payment as before provided. Accordingly twenty-five shares were sold and delivered by plaintiff to defendant, and defendant gave therefor his note for $25,000, with the stock as collateral security. After the five-year term of service defendant ceased to be a director and officer of the company. Plaintiff brought this action upon defendant's note. Defendant counterclaimed for the book value of the twenty-five shares of stock at the time he ceased to be director, and recovered judgment for the excess of such value over the amount due on the note. On appeal, upon the foregoing and other facts, the question being whether the agreement should be construed as being for the sale of a one-twentieth interest only in the corporation, so that after the reduction of the outstanding stock to 326 shares the sale was of one twentieth of that number only, this court at first decided against such construction (Marshall

Zohrlaut v. Mengelberg, 144 Wis. 564.

and KERWIN, JJ., dissenting), but afterwards, on a rehearing, divided equally—WINSLOW, C. J., and BARNES and VINJE, JJ., adhering to the former opinion, MARSHALL, SIEBECKER, and KERWIN, JJ., holding the contrary view, and TIMLIN, J., taking no part; and the judgment of the trial court was therefore affirmed.

Per MARSHALL, SIEBECKER, and KERWIN, JJ., it is suggested that this court has power and, under the circumstances, ought to send the cause back to the trial court with authority, in discretion and upon proper terms, to open the case so as to permit plaintiff to interpose an equitable defense to the counterclaim.

APPEAL from a judgment of the circuit court for Milwaukee county: J. C. LUDWIG, Circuit Judge.  *Affirmed.*

The Herman Zohrlaut Leather Company was incorporated in 1891 under the laws of Wisconsin and with an authorized capital stock of $500,000. Prior to the incorporation of the company Herman Zohrlaut had been engaged for many years in the tannery business, which the corporation was organized to carry on, and had been the principal if not the sole owner of such business. The corporation was practically a family affair. Prior to June 19, 1899, Herman Zohrlaut had never transferred to the corporation the real estate, machinery, and buildings used in connection with the business. The value of these three items of property, as shown on the balance sheet of the corporation for November 30, 1899, was $508,885.01. It appears that an appraisal of the buildings and factories had been made by the American Appraisal Company, which did not agree with the book values, but was in excess thereof. Entries were made in the books of account under date of November 30th to make the book values of these properties correspond with the values placed thereon by the appraisal company. On the other hand, the real estate values as carried on the books were somewhat reduced. These changes resulted in increasing the book value of these items of property $857.76. It further appeared that the corporation was a large borrower, and that in the statement which it made to banks as a basis for credit the real estate, buildings, and machinery were listed as part of the assets of the corporation.

On June 19, 1899, a meeting of the stockholders of the company was held at its office, and minutes were made of what transpired at such meeting, which minutes were subsequently changed, as will be hereafter indicated. It appeared from such minutes that Herman Zohrlaut was given permission to sell his stock in the corporation to *Edward Zohrlaut,* and it was further provided that the books of subscription of the capital stock of the company be opened and kept open long enough to receive subscriptions to the amount of the unsold stock, to wit, the sum of $174,000, and the board of directors was authorized to issue such stock in its discretion. The directors were authorized and empowered to purchase from Herman Zohrlaut the tannery, real estate, property, buildings, and machinery for the sum of $500,000, to be paid for by issuing to said Herman Zohrlaut $174,000 of the capital stock of the company and the balance in cash, upon his conveying said property by warranty deed to the corporation. At a meeting of the directors of the corporation held immediately thereafter a motion was carried to the effect that the purchase of the tannery property, pursuant to the resolution of the stockholders passed at their meeting, be ratified, and the vice-president and secretary were authorized to issue to Herman Zohrlaut, in payment of the purchase referred to in said resolution, the sum of $500,000, of which sum $174,000 was to be paid by the issue of the capital stock of the company to that amount, and the balance in cash.

It is fairly apparent from the testimony that the company's financial condition at this time was such that it could with difficulty, if at all, make the cash payment. A warranty deed of the real estate, buildings, and machinery in question, bearing date January 1, 1899, was executed by Herman Zohrlaut and wife to *Edward Zohrlaut* as grantee. This deed appears to have been acknowledged as to Herman Zohrlaut on June 19 and as to his wife on July 5, 1899.

The next meeting of the board of directors of the corporation was held on August 18th. The entries relating to what transpired at that meeting were substantially changed, as were the entries relating to the meeting of June 19th. The original entries noted the fact that the sale of the property from Herman Zohrlaut to the corporation, as contemplated by previous resolutions, had been consummated, but it was discovered that the deed was made by Herman Zohrlaut to *Edward Zohrlaut* instead of to the company, and recited that it was thereupon agreed that *Edward* and his wife should quitclaim to the company. *Edward Zohrlaut* and wife did in fact execute a quitclaim deed to the corporation of the property conveyed to him by his father, such deed bearing date August 16, 1899.

The stock book of the corporation shows that on June 18, 1899, a certificate for 174 shares of the capital stock was made out to Herman Zohrlaut, he signing it as president, and that such certificate remained in existence until September 14, 1899, at which time the court found that it was canceled. Entries had also been made in the books of the corporation showing that the outstanding capital stock thereof was $500,000, in lieu of the $326,000 that had been outstanding prior to the issue of the last-named certificate. Whether there had been any delivery to or acceptance by Herman Zohrlaut of the certificate in question, as part payment of the purchase price of the property sold, there is no dispute that the cash part of the payment never was paid. The referee and the court found that, concurrently with the stockholders' meeting of June 19th, *Edward Zohrlaut* purchased from his father the latter's entire holdings in the corporation, and also purchased from him the property covered by the warranty deed dated July 1st, and that such deed was executed and delivered in pursuance of such agreement to purchase, and not for the purpose of carrying out the alleged agreement

with the corporation, and that no mistake had been made in naming *Edward Zohrlaut* as grantee in such deed instead of the corporation.

Under date of August 22, 1899, the following contract was made and entered into between the plaintiff and defendant:

'*"Edward Zohrlaut,* president of the Herman Zohrlaut Leather Company, and *Rudolf Mengelberg* agree to the following:

"(1) As soon as the books of the Herman Zohrlaut Leather Company are closed for the year ending November 30, 1899, *Edward Zohrlaut* sells to *Rudolf Mengelberg* twenty-five shares of the five hundred shares of the capital stock of the Herman Zohrlaut Leather Company at a price based on the showing of the Herman Zohrlaut Leather Company's books on November 30, 1899.

"(2) *Rudolf Mengelberg* secures the payment of said shares by his notes. These notes shall bear interest at the rate of four per cent. per annum, provided that the yearly dividend earned and declared on said shares be larger than the yearly interest due on said notes. If the yearly dividend earned and declared on said shares be less than the yearly interest due on said notes, then the notes shall earn said dividend in place of interest for such year. Such stock to be held by said *Zohrlaut* as collateral for the payment of such notes.

"(3) All money earned and declared as yearly dividends on said shares in excess of the yearly interest due on said notes shall be applied towards paying off the principal of said notes.

"(4) If at any time *Rudolf Mengelberg* should not be re-elected as director and officer of the Herman Zohrlaut Leather Company, or for other unforeseen reasons be compelled to resign his position, *Edward Zohrlaut* agrees to purchase from *Rudolf Mengelberg* said twenty-five shares at a price based on the showing of the Herman Zohrlaut Leather Company's books at that time, deducting therefrom any unpaid principal and interest on such notes."

An informal meeting was held in the office of the legal adviser of the corporation on October 4, 1899, at which meeting

plaintiff and defendant were present. The plaintiff at that
time held a large majority of the capital stock of the corpora-
tion and habitually represented some of the other stockhold-
ers by proxy, and it was found by the referee and by the court
that the proceedings taken at such meeting amounted to cor-
porate action, and that at such meeting it was concluded to re-
duce the outstanding capital stock of the corporation from
$500,000 to $326,000, and to cancel the certificate of stock
issued to Herman Zohrlaut for $174,000, and to transfer such
sum to the surplus account of the company instead of carry-
ing it as a stock liability. It was also found that it was
agreed at said meeting that the minutes of the two former
meetings should be changed in so far as it might be necessary
to meet the situation, and changes were made therein either
by the attorney for the corporation or by his clerk.

The minutes of the meeting of June 19th were changed so
as to show that, instead of partial consideration for the pur-
chase of real estate, buildings, and machinery being the is-
suance of $174,000 of the capital stock of the corporation,
such consideration was the cancellation of the indebtedness,
amounting to $48,415.84, against *Edward Zohrlaut*. A pen-
cil mark was drawn through the portion of the resolution pro-
viding for the issuance of $174,000 of the capital stock to
Herman Zohrlaut, and in lieu thereof the vice-president and
secretary were authorized to cancel the $48,415.84 account
against *Edward Zohrlaut* in consideration of his conveying
the tannery property to the corporation, and in further con-
sideration of the company's assuming payment of interest on
the note or notes of *Edward Zohrlaut* to Herman Zohrlaut.
It appeared at this time that *Edward Zohrlaut* had purchased
the stock of Herman Zohrlaut in the company, and had given
his note to Herman Zohrlaut for $100,000 in whole or partial
payment therefor.

The minutes of the meeting of August 18th were changed
so as to strike out the recital therein that it was discovered

that the deed given by Herman Zohrlaut to *Edward Zohrlaut* was given by mistake and that it was intended that the corporation should be named as grantee therein.

At the time the meeting of October 4th was held one share of stock in the corporation was assigned to the defendant and he was elected a director of the company and began his employment on or about that date. On November 30, 1899, the books of the company showed that this stock, on the basis of an issue of $500,000, was worth approximately ten or twelve per cent. above par. On the basis of outstanding stock to the amount of $326,000 the books showed the stock to be worth some forty or fifty per cent. above par. The balance sheet of November 30th showed an outstanding liability in the way of a credit on open account to Herman Zohrlaut of nearly $40,000. This amount thereafter was charged off without any payment, and the surplus of the company was correspondingly increased. Such balance sheet also showed a surplus, after deducting profit and loss account, of substantially $57,000.

The referee found that the certificate for 174 shares of the capital stock of the corporation had in fact never been issued, but that, if it had, such certificate was assigned to the plaintiff by his father, and was surrendered for cancellation by the plaintiff and was canceled, and that such surrender and cancellation was ratified by the corporation; and the court confirmed such finding.

The balance sheet taken from the books of the corporation under date of November 30th showed an outstanding stock liability of $500,000 and a surplus amounting to $57,143.92. On the same day this surplus was increased $213,774.98 by entries made in the books by defendant, making the total surplus, after such changes were made, $270,918.90. The referee and the court found that such changes were made at the suggestion of the plaintiff and with his knowledge and consent. Such increase was made by reducing the stock liability

$174,000 and crediting such amount to surplus, by charging off an outstanding account in favor of Herman Zohrlaut amounting to $38,917.22 and crediting such amount to surplus, and by making a net increase of $857.76 in the book value of the real estate, buildings, and machinery, which sum was likewise credited to surplus.

Thereafter the following contract was entered into between the parties:

"The following is the agreement made and concluded by and between *Edward Zohrlaut* and *Rudolf Mengelberg,* both of the city of Milwaukee, county of Milwaukee, and state of Wisconsin, this first day of December, A. D. 1899.

"Witnesseth, that the said *Zohrlaut* agrees to employ the said *Mengelberg* for the term of five (5) years from January 1, 1900, as one of the directors and such officer as the board of directors shall during said term by vote determine, of the Herman Zohrlaut Leather Co., at the following salary, namely: for the year 1900 at the rate of four thousand (4,000) dollars per annum; for the year 1901 at the rate of forty-five hundred (4,500) dollars per annum; for the years 1902, 1903, and 1904 at the rate of five thousand (5,000) dollars per annum; such salary payable in monthly instalments at the end of each month during said term.

"And the said *Zohrlaut* further agrees in accordance with the terms of the agreement entered into between the parties heretofore on August 21, 1899, to sell to said *Mengelberg* twenty-five (25) shares of the capital stock of said Herman Zohrlaut Leather Company at par, accepting in lieu of cash the note or notes of said *Mengelberg* for the term of five (5) years from this date with interest at four (4) per cent. per annum, payable in the manner and in accordance with said agreement.

"And the said *Mengelberg* does hereby on his part agree to devote his entire time, skill, ability, and energy to the utmost of his power for the use and benefit of said Herman Zohrlaut Leather Co.; and that he will not, during the term aforesaid, engage in, or carry on, or become interested in any other business except his employment by said company in the capacity hereinbefore mentioned and at the salary aforesaid; and he

further agrees to comply with the agreement dated August 21, 1899, aforesaid, on his part to be performed, and that he will not sell, hypothecate, nor pledge the said stock, or any interest therein, to any person or persons without the written consent of the said *Zohrlaut* first had and obtained."

The testimony showed and it was found that this contract was in fact executed some time after January 1, 1900.

The defendant continued in the employ of the corporation under said contract until December 31, 1904, at which time his services were dispensed with. During the period of defendant's employment no dividends had been declared, and the net surplus of the company had been reduced in the sum of $43,700.89. Not all of this reduction, however, was due to losses in the business during this time, if in fact any of it was. Some bad accounts had been charged off; some interest had been paid by the corporation for plaintiff; and an account of the corporation against the plaintiff had been canceled.

When the defendant left the employ of the plaintiff he took with him the stock which he had purchased, and which the contract provided should be left with the plaintiff as collateral security for the payment of the note given in pursuance of the terms of the contract, and plaintiff was obliged to commence an action of replevin to recover the possession of such stock. Thereafter the plaintiff brought this action to recover from the defendant the sum of $25,000 alleged to be due upon the note. The defendant counterclaimed in the action for the amount of the book value of his stock, as of December 31, 1904, over and above the sum of $25,000 due on the note. The trial of the action resulted in an affirmative judgment in favor of the defendant for $14,312.50 damages, together with interest and costs, from which judgment this appeal is taken.

For the appellant there was a brief by *Nath. Pereles & Sons,* attorneys, and *Quarles, Spence & Quarles* and *Glicksman, Gold & Corrigan,* of counsel, and oral argument by *W. L. Gold* and *T. W. Spence.*

For the respondent there was a brief by *Winkler, Flanders, Bottum & Fawsett,* and oral argument by *J. G. Flanders* and *C. F. Fawsett.*

The following opinion was filed January 11, 1910:

BARNES, J.   There is ample evidence in the record to support the finding of the referee to the effect that if the stock certificate for $174,000 had ever been issued it was surrendered and canceled prior to December 1, 1899.   Whether there was any valuable consideration to support such a transaction is more debatable.   The argument of defendant's counsel, that the cancellation of a debt amounting to about $48,000 and the assumption of certain interest obligations by the corporation constituted a good consideration, is not convincing in view of the fact that the plaintiff turned over $326,000 worth of other property to the corporation and assumed an indebtedness to his father of over $38,000, for which no consideration was paid except the settlement of the account referred to and the interest agreement.   However, the question is not particularly material.   The plaintiff might make a donation of a portion of his stock to the corporation in this case if he saw fit, and the important fact is that he did surrender the stock and that it ceased to be a corporate liability on the date named.

We find little in the way of evidence, or of inference to be drawn therefrom, to justify the contention that defendant took a decaying business and built it up.   The evidence fails to show insolvency or anything approaching it when the defendant bought in, and it is difficult to discover wherein, after his five-year term of service, he left the business in much better condition than he found it.   The only thing to indicate that he found nominal book assets and left actual ones is the fact that some bad accounts were charged off the books, but the amount was inconsiderable, and the net assets declined some $43,000 during the period of his service.   The charging

off of the account standing on the books against the plaintiff, and the assumption by the corporation of interest charges on the individual debt of the plaintiff, affected the showing made by the business while defendant had charge of it, but, considering its magnitude, about all that can be said for it is that it held its own.

It seems clear that when the parties made the contract of August 22d, by which plaintiff agreed, on the happening of a certain contingency, to repurchase the stock which defendant agreed to buy, the parties contemplated that if the business proved to be profitable and the surplus was increased by legitimate earnings during the term of defendant's employment, the latter should be paid his *pro rata* share of the increase, and that if loss resulted he should suffer his *pro rata* share of such loss. The net surplus of the corporation was increased on November 30, 1899, $213,774.98 by entries made in the books of account. This increase did not add a single dollar to the financial strength of the corporation, unless the wiping out of the account of $38,917.22 in favor of Herman Zohrlaut reduced its indebtedness to that extent, and it is not at all certain that Mr. Zohrlaut ever agreed to forego his claim against the corporation for this sum. It seems highly improbable that the plaintiff understandingly signed the agreement of December 1st with a full realization of the consequences that might result from such action. The defendant paid par for $25,000 of the capital stock of the company. Had he been taken ill with some malady that would prevent his performing the work required of him by the contract, the next day after its execution, he would be entitled to recover from the plaintiff not only the purchase price, but also about $17,000 in addition thereto. His heirs might do the same had he died. The recovery at such time would have amounted to about $2,700 more than the damages awarded in this action, because the book value of the stock had declined over $43,000 in the meantime. The improbability of a party

making such a contract, as well as the manifest inequity of it, has led the court to scrutinize with great care the two written ·contracts, as well as the evidence in the case, to ascertain whether relief could not be afforded to the plaintiff against a judgment founded upon what appears to have been an' improvident contract.

The only rational explanation of how this contract of De- ·cember 1st came to be made is suggested by the referee in his ·decision, where he expresses the belief that when the second ·contract was signed the parties overlooked the fact that the :stock liability of the corporation, as shown on its books, had been reduced $174,000 between the dates of the two contracts, .and that neither realized that in the meantime the book value ·of the stock had been enhanced over forty per cent. It seems to us that this conclusion is correct, at least as to the plaintiff, :and that the contrary finding made by the referee is incorrect.

In order to properly construe a contract susceptible of more than one construction, the court should place itself as nearly ·as it may in the position of the parties who made it, by con- .sidering the surrounding facts and circumstances, the nature ·of the subject matter, the relation of the parties to the con- ·tract, and the objects sought to be accomplished thereby. 2 Page, Cont. § 1123; *Mayer v. Goldberg*, 116 Wis. 96, 92 N. W. 556, and cases cited. When the language used in a ·contract is susceptible of more than one meaning, it is essen- ·tial that the court should understand the conditions that ex- isted when the contract was made, in order to adopt that con- ·struction which would express the true intent and meaning ·of the parties.

However, it is the duty of courts "simply to enforce con- tracts, unexceptionable on other grounds, precisely as the par- ·ties have made them, instead of making new contracts for ·them to meet the emergencies of a particular case, or to avoid some supposed inconvenience or hardship arising from the ·natural import of the written engagement. And the written ·instrument furnishes the best possible evidence of the inten-

tion, and determines the liabilities of the parties." *Heath v. Van Cott,* 9 Wis. 516, 522.

"In construing a contract it must be observed that, while the office of judicial construction is to give effect to the intention of the parties, and that words and sentences should be so construed as to subserve such intention, this does not mean that violence may be done to the words the parties see fit to employ, but only that it is the duty of courts to look at the whole and every part of the contract, and to give that construction to it which will make it effectual to carry out the real intention of the parties so far as the words they see fit to employ will permit, without doing violence to the rules of language or the rules of law." *Braun v. Wis. R. Co.* 92 Wis. 245, 247, 66 N. W. 196, 197.

And in construing contracts the courts "cannot give effect to the intention, however manifest, which plainly violates the rules of language or of law." *Mississippi River L. Co. v. Wheelihan,* 94 Wis. 96, 98, 68 N. W. 878, 879; 2 Parsons, Cont. 494.

Words may not be added to a contract unless obviously implied. Where the language used is not ambiguous the apparent import of the words must govern. Where the words used are of uncertain meaning, within certain limitations, that construction should be adopted which will best effectuate the intention; but words should not be constructively put into a contract that are not there. *Mississippi River L. Co. v. Wheelihan, supra.* When plain language is used in such a connection as to leave no room to say reasonably that the parties may have intended either of two meanings, the apparent import of the words as generally understood must govern. *Thurston v. Burnett & B. D. F. M. F. Ins. Co.* 98 Wis. 476, 479, 74 N. W. 131; *Wells v. M. & St. P. R. Co.* 30 Wis. 605; 1 Story, Cont. (5th ed.) § 780.

In speaking of an improvident provision made in a conveyance this court in another case said:

"But so long as the parties saw fit to insert in the grant plain words of limitation, pointing to particular instruments for measuring the water, we must hold to such plain meaning,

and not, for the purpose of relieving parties from difficulties which were not properly provided against at the proper time, put words into the grant by construction. That would be a violation of rules of law by judicial construction, and courts are not permitted to do that." *Appleton P. & P. Co. v. Kimberly & C. Co.* 100 Wis. 195, 201, 75 N. W. 889, 891.

In answer to the contention of counsel that testimony of the circumstances surrounding and leading up to the making of a written contract are always admissible for the purpose of putting the court in the position of the parties at the time the contract was made, this court has said:

"Not so! Where there is no ambiguity in the contract, either in its literal sense or when it is applied to the subject thereof, it must speak for itself entirely unaided by extrinsic matters. Where such ambiguity does exist, then evidence of the circumstances under which the contract was made is proper to enable the court in the light thereof to read the instrument in the sense the parties intended, if that can be done without violence to the rules of language or of law." *Johnson v. Pugh*, 110 Wis. 167, 170, 85 N. W. 641, 642.

Parties cannot use terms with a fixed and certain meaning and then disclaim such meaning; at least not without reformation of the contract. *Murphey v. Weil*, 92 Wis. 467, 473, 66 N. W. 532.

Under cover of construction a court cannot reform a written contract to make it express the real intention of the parties, which, by mistake, is not expressed in the words thereof. *Robbins v. Rollins*, 127 U. S. 622, 8 Sup. Ct. 1339; *Te Poel v. Shutt*, 57 Neb. 592, 78 N. W. 288; *Sinclair v. Hicks*, 116 N. C. 606, 21 S. E. 395; 2 Page, Cont. § 1130. Courts of equity may reform contracts for mistake or fraud when the modicum of proof required by the established rules of law is furnished to warrant reformation. *Braun v. Wis. R. Co.* 92 Wis. 245, 248, 66 N. W. 196, and cases cited.

Applying the foregoing rules of law to the facts in this case, is the plaintiff entitled to relief? His contention is that the

contract of August 22d provided for a sale of twenty-five of the five hundred shares of the capital stock of the corporation, or a one-twentieth interest therein, and that for the purposes of this case the subsequent contract should also be treated as a sale of a one-twentieth interest in the corporation, and that the decrease in the capitalization of the company in the interim between the execution of the preliminary and final contracts should not be held to affect the rights of the parties.

It must be remembered, however, that the plaintiff, by the contract dated December 1st, did sell and convey to the defendant, subject to his lien to secure the payment of the purchase money, twenty-five shares of the capital stock of the company as it then was, without any reference being made in the contract to the fact that any particular fractional interest in the corporation was sold, and that nothing was done by the plaintiff for a period of more than five years thereafter to indicate that he had in fact intended to sell but a one-twentieth interest instead of the much greater interest that he did in fact sell. No implication can be drawn from the contract that it was intended to sell any other or different interest from that expressly provided for. By said contract the plaintiff agreed, "in accordance with the terms of the agreement entered into between the parties heretofore on August 21, 1899 [meaning, no doubt, August 22d], to sell to said *Mengelberg* twenty-five (25) shares of the capital stock of said Herman Zohrlaut Leather Company at par." This provision can only be held to mean that the twenty-five shares of stock provided for in the former contract were to be sold by plaintiff to defendant. It cannot mean that the provisions of the former contract as to price should govern, because the parties specifically stated otherwise. If the amount of stock remained unchanged, the plaintiff would be entitled under the preliminary contract to receive about $2,700 above par for the stock sold, on the basis of any calculation, and over $2,000 more than that sum if there had been no change made in the stock

liability of the company, and if the other entries on the books under date of November 30th were taken into account. The contract of August 22d called for the sale of twenty-five shares of stock, and by the contract of December 1st that number of shares were sold and transferred to the defendant; and, without doing violence to the language used by the parties in making their contract, we fail to see how we can hold that a smaller number of shares were sold, or how we can say that a settlement should be made on any other basis than that provided by the parties themselves in their contract.

We are impressed with the belief that the evidence and the reasonable inferences to be drawn therefrom satisfactorily show that plaintiff mistakenly either sold a greater amount of stock than he would have sold had he comprehended the effect of the book entries of November 30th, or that he sold the amount of stock which he did at a less price than he would have sold it had he realized the extent to which the book value of the stock had been so suddenly and so materially enhanced. It may be that, had he seasonably applied to a court of equity for a reformation of the contract, he would have been entitled to relief. The plaintiff, however, has brought an action at law on the note given in payment for the stock, and, if relief is given at all, it must be by a construction of the contract, which is not permissible as it stands. In other words, we see no escape from the conclusion that by the terms of the written contract the plaintiff did, on December 1st, sell twenty-five shares of the capital stock of the corporation, and obligated himself to repurchase it in the event of a certain contingency arising, and which did arise in this case, and to purchase the stock at its book value at the time the contingency arose.

We do not think the defendant had done anything to forfeit his right to insist that the plaintiff purchase his stock under the terms and conditions provided in the contract between the parties. Neither do we think any error was committed in refusing to allow interest on the note sued upon. No divi-

dends were declared by the corporation after defendant pur-
chased the stock, and the contract of August 22d, which was
referred to in the one later made, clearly provided that inter-
est should not be charged in excess of the dividends declared.

The evidence offered was directed to the book value of the
stock of the corporation on December 1, 1904. The defend-
ant continued in the employ of the company until January 1,
1905. It is argued that the evidence offered did not establish
the book value of the stock of the corporation as of the proper
date. The date of December 1st was selected, presumably,
because the corporation closed its books on that date. The
variance in time between the two dates is slight, and it is
highly improbable that there was any substantial difference
between the value of the assets between December 1st and
January 1st, or that the assets were less on the latter date
than on the former. The books were within the immediate
control of the plaintiff, and if any substantial difference ex-
isted it might readily have been shown by him. Technically
the plaintiff was entitled to recover on the basis of the book
value of the stock on January 1st. But we think the evi-
dence offered substantially proved that value, and that no
good purpose would be served by prolonging this litigation in
order to determine whether there was a slight variation in the
surplus of the company between these two dates.

*By the Court.*—Judgment affirmed.

TIMLIN, J., took no part.

A motion by the appellant for a rehearing was granted on
April 5, 1910, and the cause was again argued on October 29,
1910.

For the appellant there was a brief by *Nath. Pereles &
Sons,* attorneys, and *Quarles, Spence & Quarles* and *Glicks-
man, Gold & Corrigan,* of counsel, and a separate brief by
*T. W. Spence,* of counsel; and the cause was argued orally by
*Mr. W. L. Gold* and *Mr. Spence.*

For the respondent there was a brief by *Winkler, Flanders, Bottum & Fawsett,* and oral argument by *James G. Flanders.*

The following opinion was filed November 15, 1910:

PER CURIAM.   A motion for a rehearing was granted in this case and the same has been reargued.   Chief Justice WINSLOW and Justices BARNES and VINJE are agreed that the former decision was correct.   Justices MARSHALL, SIE-BECKER, and KERWIN reach a contrary conclusion.   Justice TIMLIN, having been of counsel in the case, did not sit.   This situation results in an affirmance of the judgment.

*By the Court.*—Judgment affirmed.

The following opinion was filed November 19, 1910:

MARSHALL, J. (*dissenting*).   Three of the six justices, Justice SIEBECKER, Justice KERWIN, and the writer, who participated in this case believe the judgment to be unjust and that it should be reversed.   It is regrettable that appellant cannot have a decision, the whole bench participating.   The situation is out of the ordinary class of cases disposed of by a divided court.   Generally no opinion is filed.   Here the equal division developed after an opinion had been filed which now stands as showing the reasons for the affirmance. So the case particularly calls for an opinion, stating the reason why one division of the court, equal in number with the other, now believes the judgment to be wrong.

There is no very good room for differences of opinion respecting the legal questions involved.   The authorities cited in the opinion by Justice BARNES state the law as regards the situations with which they dealt.   They announce mere elementary principles, as do many other cases that might have been referred to, specially, but were not, perhaps, because it was thought they were not in full harmony with those which were cited.   We refer to cases of which the following are good samples: *Steele v. Schricker,* 55 Wis. 134, 12 N. W. 396;

*Boden v. Maher,* 105 Wis. 539, 543, 81 N. W. 661; *Excelsior W. Co. v. Messinger,* 116 Wis. 549, 553, 93 N. W. 459; *Hackley Nat. Bank v. Barry,* 139 Wis. 96, 120 N. W. 275; *Hart v. Hart,* 117 Wis. 639, 648, 94 N. W. 890; *Newell v. New Holstein C. Co.* 119 Wis. 635, 639, 97 N. W. 487; *Mitchell v. Mitchell,* 126 Wis. 47, 50, 105 N. W. 216; *U. S. G. Co. v. Gleason,* 135 Wis. 539, 116 N. W. 238.

If there were any warrant for doubting the existence of harmony between these authorities and the others and reaching a conclusion upon the theory that if a contract, looking at its words alone, means clearly one thing, it cannot be shown to be ambiguous by applying it, with or without the aid of extrinsic evidence, to the subject with which it deals, and then given a different meaning if necessary to effectuate the intent of the parties; it seems there was not such warrant when the cause was taken up for consideration, since any such misconception as existed respecting such want of harmony had been, in the meantime, cleared up. *Klueter v. Joseph Schlitz B. Co.* 143 Wis. 347, 128 N. W. 43.

In the *Klueter Case* the court endeavored to set at rest, as it often had before, all questions as to what aids may be called in for the purpose of discovering ambiguity and how obscurity of meaning, when discovered, can be cleared up. We are safe in saying that the court was successful, especially as regards the bearing of principles on this case, since eminent counsel for the respective parties frankly conceded on the reargument that the rules were stated in all respects correctly, and as they had always been maintained in this and other courts. It was rather conceded, as we supposed, when the case was decided, that if it be legitimate to show that a contract which is plain, looking at the words only, is not so when applied by the aid of extrinsic evidence to the subject with which it deals, and then for the purpose of clearing up the obscurity, the facts and circumstances characterizing the making of the contract may be shown by extrinsic evidence; thus.

enabling the court to view the writing from the standpoint of the parties when they made it, it was at least a very grave question whether plaintiff could recover.

Counsel for the respondent on the reargument necessarily had to come out from, if they before went into, hiding behind the idea that ambiguity cannot be disclosed and cleared up in the manner indicated, which was, seemingly, the refuge here of the court on the former occasion. Counsel on the second argument planted themselves firmly on the ground that the contract is not ambiguous either in its literal sense or when applied, with or without extrinsic evidence, to the subject with which it deals; and that taken either way the only meaning which can be read out of it is the one which forms the basis for the judgment complained of; that if the minds of the parties did not meet on that precise meaning, which counsel would not concede, they failed to use language from which, by the rules laid down in the *Klueter Case,* any other reasonable meaning can be fairly gathered than the one discovered by the trial court. We must assume that such is the attitude of the justices who adhere to the former affirmance.

From the foregoing we assume the doctrine of the *Klueter Case* and those therein referred to not be open to question. Therefore the right of the matter in controversy is to be tested by these rules:

1. A written contract cannot be varied by parol evidence.

2. A written contract, if plain in its literal sense and when applied to the subject with which it deals, must speak without the aid of extrinsic evidence.

3. The intent of the parties to a written contract, so far as it can be read, by aid of construction, out of the writing, but not otherwise, must be taken to be, in the legal sense, the contractual intent.

4. In the construction of a contract no meaning can be properly attributed to it other than one which by rules of construction can be found in it, but all words necessarily or rea-

sonably in place by implication should be deemed to be actually in place.

5. If a written contract, either looking to the words alone or when applied, with or without the aid of extrinsic evidence, to the subject with which it deals, is ambiguous, the court may, aided by evidence of the facts and circumstances characterizing the making of it, give effect to the real intent, so far as it can reasonably be read out of the writing without violating the rules of language or of law.

6. It is to be presumed that the parties to an agreement did not intend to make an absurd or a very unreasonable one,— one that two men, acting understandingly, could not fairly be expected to make. Therefore when the apparent meaning of an agreement, either in the words by themselves or by applying them to the subject matter, is unreasonable or absurd, ambiguity exists requiring to be solved by judicial construction.

Now let us give a brief *resumé* of the facts and then apply the foregoing thereto.

June 18, 1899, a certificate for 174 shares, making up the full capital stock of 500 shares, was duly made by the officers of the Herman Zohrlaut Leather Company in favor of Herman Zohrlaut to carry out a contract between him and the corporation in respect to its purchasing certain property of him. The contract was, in the end, substantially carried out but not at all in the manner contemplated. At or about the date of the contract *Edward Zohrlaut* took over the interest which Herman owned in the corporation, including his right to the 174 shares. Whether the certificate for such shares was delivered does not appear. The indications are rather to the contrary, and that no formal transfer was made to *Edward*, but that the certificate remained with the corporation till canceled as hereafter stated. However, appropriate entries were made so that, August 22, 1899, the books showed the 500 shares to be outstanding and that equitable ownerships in the corporate assets existed accordingly. It was then agreed between *Edward*, president of the corporation, and defendant, *first*, that

the former should sell to defendant *"twenty-five shares of the five hundred shares of the capital stock"* as of November 30, 1899, at the book price according to the then closing price thereof, the purchaser to give his interest-bearing note therefor, the stock certificate to be held as security for payment thereof, the dividends to apply on interest up to the fixed rate therein, and any surplus on the principal, and, if less in amount than such rate, to offset the interest; *second,* that in case of defendant ceasing to be a director the seller should repurchase *"said twenty-five shares"* at the book value at the date of repurchase, less any unpaid principal of the notes.

October 4th, at a meeting of directors, both parties being present, it was agreed to reduce the capital stock to 326 shares by canceling certificate for 174 shares. No change was made in the books till after the date fixed for determining the book price of stock under the agreement to sell the twenty-five shares. The books then showed that the stock was worth about 110. Thereafter they were changed in accordance with the agreement of October aforesaid, thus increasing the book value of twenty-five shares somewhere around $14,000.

After such change *Zohrlaut* and defendant made a contract, supplementary to that of August 22d and without any negotiations varying the essential terms of sale and purchase as aforesaid. In such second agreement *Zohrlaut* promised, among other things, "in accordance with the terms of the agreement of August 22d," to sell defendant twenty-five shares of the capital stock of the corporation, taking his notes therefor substantially according as before stipulated.

This supplementary agreement was made December 1, 1899, though not executed till the following January. Thus the first agreement as to taking back the stock without change survived the supplementary agreement. The sale was consummated on the basis of the first agreement, *i. e.* the book value of November 30, 1899, before the 174 shares were canceled.

Years after the last occurrence mentioned, upon the contin-

gency arising making operative the agreement to repurchase,. defendant claimed the benefit of twenty-five shares on the basis of the corporate assets belonging to the owners of 326 shares, whereas he bought on the basis of their belonging to owners of 500 shares. The book value of the total assets had decreased in the meantime, but such value per share had greatly increased by the cancellation of stock. The claim of defendant prevailed, resulting in a judgment against appellant for $14,312.52, and interest, making, with costs, $17,606.78, for which the latter did not receive and the former did not give any consideration whatever; plainly a profit which was not within the contemplation of the parties when the agreement was made. It prevailed upon the theory that, regardless of what the real intention was, no other, with or without the aid of rules for construction, could be gathered from the writings than the one the court adopted.

The result indicated convicts the parties of having made a contract so very unreasonable that probably all would readily agree the minds of such parties never met upon a transaction which could produce it. That renders the meaning of the writings obscure if otherwise they would be plain, a situation for judicial construction under the aforementioned elementary principles.

True, if a meaning leading to such an absurd result is the only one which can reasonably be discovered within the scope of the language used in the writings, then that meaning, as indicated in one of the rules, must prevail if the contract be enforced at all as written. True, however, as also indicated, the intention of the parties must prevail and their words be bent to that end, if need be, so far as that can be done reasonably. True, also, as indicated, no meaning can be properly ascribed to such words other than such as can be found within the scope thereof. So far as the parties failed by mutual mistake, or fraud on one side and mistake on the other, to embody their real meaning in the writing, the mutual purpose cannot be effectuated without equitable interference.

It seems that all must agree that the meaning which has prevailed is so inequitable that, not only it should not prevail if a reasonable one can be fairly read out of the writings, but, if no such reasonable meaning can thus be found, then the parties utterly failed to put into such writings what their minds met upon.

The foregoing certainly calls for extending or restricting the meaning of the language of the writings to the utmost reason will permit in order to find therein a reasonable one in harmony with the intent of the parties. That intent, independently of the writings, must be conceded to be unmistakable, viz.: that the stock should be sold to respondent on a particular basis and bought back, upon a contingency mentioned, upon precisely the same basis, subject to change in the meantime, one way or the other, according to the profitableness or otherwise of the business; that there was no thought of any probability, or even possibility, of the value being enhanced or depreciated by mere bookkeeping, stock being increased in value without any increase in value of assets. That seems too clear for reasonable doubt. We do not understand there is any serious difference in respect thereto. The difference is in whether such manifest intent can be read out of the writings by aid of rules for construction which the court has recently held, and which counsel for both parties, as before indicated, agree our books lay down plainly and harmoniously. We now turn to the writings.

It is significant that both papers contemplate a sale price according to the state of the books November 30, 1899, and upon a basis of there being 500 shares of stock, and that the idea was to give respondent during his term of employment a share of the profits on the basis of his having twenty-five of five hundred shares of stock. It is not probable, it was thought respondent would ultimately pay for the stock. It was set aside merely to represent his proportion of the prospective profits or losses of the business on the basis of one to twenty. The stock was retained with the note, one being

considered equivalent to the other, except for prospective profits sufficient to more than pay interest on the notes.    Let us not lose sight of significance of the fact that the sale was of twenty-five shares according to the book value of the stock divided into 500 shares.    The notes were given in accordance therewith.    They were not given till after the change in the book value by cancellation of the 174 shares and after the making of the supplementary agreement, expressly providing that the sale should be "in accordance with the terms" of the first agreement.    Let us also keep significantly in view that the certificate was left with the notes, the one being supposed to be and remain the exact equivalent of the other, subject only to change as aforesaid, which was true on the basis of the stock sold being *"twenty-five shares of the five hundred shares,"* but not true on the basis of its being twenty-five shares of the 326 shares.    Let us also keep prominent that the agreement to buy back referred to the subject to be dealt with, not as twenty-five shares of the capital stock but *"said twenty-five shares,"* i. e. twenty-five shares of five hundred shares.    Does not that feature plainly indicate upon the very face of the writings, unmistakably, a purpose to take back the precise interest sold, namely, one twentieth of the capital stock?    If not, such being the manifest purpose, unless we are to convict the appellant of being incapable of contracting intelligently, does it do violence to rules of language or of law to read, as in place after the words "agree to purchase said twenty-five shares," the words "of five hundred shares," repeating thus the words describing the same subject when it was one of sale to respondent?

No rule for construction of contracts, statutes, and constitutions is more firmly established than that, while words cannot be arbitrarily interpolated into a writing, even to carry out the manifest purpose of the authors thereof, that purpose may and should be effectuated by reading as in place all words which are there by reasonable or necessary implication.    All

elementary and judicial authorities might be successfully appealed to on that, but our court has declared it over and over again and most significantly on two occasions at this term of court. *Mississippi River L. Co. v. Wheelihan,* 94 Wis. 96, 98, 68 N. W. 878; *Klueter v. Joseph Schlitz B. Co.* 143 Wis. 347, 128 N. W. 43; and *State ex rel. McGrael v. Phelps,* 144 Wis. 1, 128 N. W. 1041.

True, under cover of construction, the court cannot relieve parties from a mistake in not expressing their real intention in their written agreements. But should that plain rule, which all admit, blind us to the rule of equal dignity, that the court can give effect to the intent of the parties so far as it can be read out of their writings within the uttermost scope of the language thereof, and by the aid of the broad power of judicial construction,—and that it is its duty to do so? Does it not seem that one rule, to which all agree, is given such prominence by one division of the court that its overshadowing dignity, for the time, has obscured that other rule, which all must agree is of equal significance, that words can be given a very narrow or very broad meaning, departing far distant, in some cases, from the ordinary meaning, and words can and should be deemed to be in place which the context and subject matter reasonably suggest, in order to prevent the injustice of the real purpose not being carried out, giving one party an advantage over the other which was not within their mutual contemplation as within reasonable probabilities? Must we not, in all such cases as this, bear in mind that, while a meaning not within the scope of a contract cannot be put there by construction to help out a party who through mistake failed to use language to express his purpose, the very office of judicial construction is to save parties from their failure, through negligence or mistake, to express unambiguously their purpose, if they expressed it discoverably? Upon that valuable instrumentality the rightful vitality of writings commonly depends. It is by no means an instrumentality to be re-

garded with disfavor and used reluctantly. Right the reverse, as the teachings of the learned text-writers and judicial authorities and our own books amply show. The intent is never to be sacrificed to the letter where that can reasonably be avoided, but rather the letter, within the boundaries of reason, is to be sacrificed to the intent.

Doubtless apparent conflicts seem now and then to come from comparing instances where the court has, seemingly, applied rules for construction with apparent reluctance, with others where the same rules were applied with the utmost liberality, the court in the latter appearing to be more keenly alive than in the former to its great function to administer justice in fact as well as in form, sweeping aside the mere literal sense of words as forming no obstacle whatever to the supremacy of mutual intention, if expressed at all, however obscurely. Many instances of this might be given, but they are so numerous and so well known and the underlying principle is so familiar that citations are omitted.

The ultimate duty in construing contracts is well phrased in 2 Parsons, Contracts (9th ed.) 496, thus:

"The rule of law is not that the court will always construe a contract to mean that which the parties to it meant; but rather that the court will give to the contract the construction which will bring it as near to the actual meaning of the parties as the words they saw fit to employ, when properly construed, and the rules of law will permit."

So it will be seen that the first question in construing a contract of double meaning is, What was the intention of the parties? That, as indicated, may be determined by applying the writing, with or without the aid of extrinsic evidence, to the subject with which it deals. Here the intention is manifest, i. e. to sell and buy back, if necessary, a certain interest in the corporation, measured by twenty-five out of five hundred shares, so that the person holding the title in the meantime would participate in the profits of the business in the

proportion of one to twenty and that the seller should resume his title, if necessary, without loss other than the proportional losses which might accrue in operation of the business.

The next question is, To what extent was such intent embodied in the writings by the most liberal treatment thereof which rules of language and of law will permit? Any failure to go to that extent to save the intent, is a failure of justice attributable to the court. Any failure after going to such extent to find that the real intent was embraced in the writing, is a failure of justice attributable to the parties themselves, which only equity can relieve them from. Manifestly there should be no failure to discover such intent to be expressed where it is perfectly manifest, as here, without first exhausting the whole arsenal of weapons for construction which the law has furnished us with.

It seems to us that the fair meaning of the writings upon their face is that the transfer and retransfer of stock referred to the same interest as compared with the same whole, or assets subject to change in value of the latter by operations of the business. If that were not so it seems to us that by the rules for construction to which we have referred, such meaning can be very easily found embodied in the language of the parties, and that the result of the litigation below left binding on appellant because of the equal division is to make for the parties and enforce a contract which they had no thought of making.

If we could not otherwise come to the conclusion above indicated, the treatment of the contract by the parties at the time the notes were given would settle the matter. The notes, as before indicated, were not given until long after the entries were made reducing the capital stock to 326 shares. As said, they were obviously given and taken as the equivalent for the twenty-five shares, as the fact was, on the basis of such shares representing such proportion of the assets of the corporation as one to twenty. They were not, however, by some $14,000,

on the basis of such shares being a part of a total of 326 shares.    So by practical construction the parties solved any ambiguity which otherwise might have existed in the writings.

We will not discuss the matter further.    We have no apology to make for discussing it at so great length.    Since the opinion on the former hearing is to remain on file, once, but not now, concurred in by a majority of the court, it has seemed quite necessary for us to adequately emphasize our dissent from the result which stands, under the circumstances, only upon the dignity of the trial court's decision.

The injustice, from an equitable standpoint at least, of the result of this litigation, is such that, doubtless, there would be a prevailing inclination to open the way to avoid it if there were a prevailing idea that judicial power existed to do so. That opens up an important field of inquiry which duty calls upon us, it seems, to explore.

Attention has been called to *Wis. M. & F. Ins. Co. Bank v. Wilkin,* 95 Wis. 111, 69 N. W. 354, as suggesting the way to opportunity for yet presenting an equitable defense.    There plaintiff recovered on the hard-and-fast lines of a contract. Defendants, through excusable mistake of counsel, depended, as here, upon a favorable construction of the agreement. Only after an expensive trial below in which they prevailed, and a review on appeal in which they failed and judgment was ordered for plaintiff, was it discovered that no relief was obtainable from the harsh results of the writing except by successfully invoking equity authority of the trial court for reformation.    In that situation a motion was made here in the nature of a motion for a rehearing for a modification of the mandate so as to permit the trial court, in its discretion, to allow the answer to be amended setting up the appropriate equitable defense.    The motion was granted, likewise was the motion in the trial court for leave to amend, the case was tried in its new aspect, the defendants prevailed, and on appeal to this court the judgment was affirmed.    [*Wis. M. & F. Ins.*

*Co. Bank v. Mann,* 100 Wis. 596, 76 N. W. 777.] That
would seem to furnish a pretty good precedent for likewise
modifying the mandate here.

True, in the former case the judgment appealed from was
at first reversed. That feature alone we do not think barred
the way to the application for leave to amend. Further, in
that case, a motion was made here, specially, for a modifica-
tion of the mandate. But the fact that the case now will go
back with a judgment, while in the former it did not, cannot
make any difference, in our judgment, if the time has not ex-
pired below—beyond any relief even by aid of this court, to
set aside the judgment on terms. Neither can the fact that
appellants have not specifically asked for a modification of
the mandate, and authority to the trial court to entertain a
motion to set up a new defense which, by mistake, was omitted
to be timely made,—since the case is fully under control of the
court to grant such relief on the motion for a rehearing, or
even without any motion at all. The hands of this court are
by no means otherwise tied so as to prevent it from doing jus-
tice in a case over which it has jurisdiction. It need not wait
to be invoked for the special relief, or invoked at all. The
common and ordinary way is for the court to wait to be moved,
but it need not, necessarily, and in a case of exceptional hard-
ship it ought not to. The sacred thing which this great court
should preserve and conserve, at all times and under all cir-
cumstances, is the real right of the matter in controversy.

It is suggested that to affirm a judgment, making it that of
this court, and then empower a trial court to open up the case
would be without precedent. Granted. But are the wheels
of justice to be efficiently impeded, or are we to hold that the
instrumentalities to attain justice have been exhausted, be-
cause of no precedent being in sight? In *Wis. M. & F. Ins.
Co. Bank v. Wilkin, supra,* and many other cases which
might be mentioned where very valuable rights were involved,
the power of the court to deal efficiently was challenged, not

so much upon principle as because of a dearth of precedent. In all such situations the principle is the dominant thing, as the court has often said. If it were not for appreciation of its dignity our system would be far less adequate to redress and prevent wrongs than it is in fact. It is not thought that the broad constitutional and inherent power of our judicial system to deal efficiently with new situations, can be adequately measured by precedent.

One pretty good answer to the suggested anomaly of affirming a judgment and then permitting the trial court to proceed in the case in a way to disturb that judgment, is that the judgment as affirmed is, in effect, conditional. Moreover, the court is not without precedent to proceed in an action in the trial court, after judgment, without disturbance thereof till it appears to be so inequitable that it should not be enforced. Why may not an issue, in the peculiar circumstances, by permission of this court, under the statutes hereafter referred to, be made up in the nature of the remedy by *audita querela* and tried, having the same effect, in the ultimate, upon the judgment rendered as an independent action to prevent the enforcement thereof upon the ground of its inequitable character?

At this point we are discussing the question of power. That may exist and yet should be very sparingly exercised so not to invade the wise public policy and that of the written law, that judicial controversies should be terminated without exact justice being reached rather than be prolonged unreasonably.

But it is suggested that this court is powerless to give any efficient relief by modifying the mandate so as to permit the trial court to hear an application to excuse the mistake, as our associates would claim, of failing to set up an equitable defense to respondent's claim seasonably, because the time for granting such relief is limited by sec. 2832, Stats. (1898), to one year after notice of the entry of the judgment, which time has obviously expired.

True, the general understanding is that after the lapse of the year prescribed in such section the trial court should be deemed to be without jurisdiction to vacate its judgment and grant a new trial of the same or new issues brought in by amendment; that remedies for relief from such a judgment are confined to such as this court affords by writ of error or appeal, or such as is within the power of the trial court in exceptional cases by an independent equitable action to enjoin the enforcement of the judgment. *Crowns v. Forest L. Co.* 102 Wis. 97, 78 N. W. 433; *Zinc C. Co. v. First Nat. Bank,* 103 Wis. 125, 137, 79 N. W. 229; *Ludington v. Patton,* 111 Wis. 208, 248, 86 N. W. 571; *Uecker v. Thiedt,* 133 Wis. 148, 113 N. W. 447.

Is it true that there is absolutely no remedy in the action affordable in the trial court in a case of this sort after the expiration of one year from the entry of the judgment, even supplemented by all the boundless supervisory power of this court?

Sec. 2831, Stats. (1898), provides that except as "otherwise specially prescribed by law, the court . . . may also, on motion and good cause shown, in discretion and upon such terms as may be just, allow any" proceeding to be done "after the time limited by or in pursuance of the statute or by any order of court." That is a very broad provision. It is difficult to mention any case falling within the term "otherwise specially prescribed by law" except the time for taking appeals. That is so prescribed in the section itself. It has been held to apply to sec. 3766, which, in language quite as mandatory as that in sec. 2832, provides that the circuit court shall dismiss a case appealed thereto from justice court unless brought to trial before the end of the second term after the filing of the return of the justice therein, or continued by special order for cause shown. However, it has been held that, long after the expiration of the time limit and after actual dismissal of the appeal on that ground, the court has power to reinstate the case under sec. 2831. It may be that and similar cases are

not in strict harmony with *Miami Co. Nat. Bank v. Goldberg,* 126 Wis. 432, 105 N. W. 816, where it was held, in effect, that sec. 2831 does not apply to cases under sec. 2867, but an examination of the two statutes will disclose a difference furnishing some warrant for the differing holdings, and it will be observed that the difference does not exist as to sec. 2832. Probably the situation in the cases generally as to the court being without power are to be regarded as meaning that though it has power, under its broad constitutional authority, it ought not to use it where the legislature has reasonably provided that it shall not, and where it should not for that reason exercise its constitutional authority, it should be regarded, to all intents and purposes, to be without jurisdiction.

So it may be conceded for the purposes of the discussion that a trial court should, unless aided by this court, regard itself as without jurisdiction to open a case for further hearing unless the motion therefor is made within the time limited in sec. 2832.

Notwithstanding the foregoing, can this court properly act in the circumstances before us? Its power of superintending control is very great. It is as boundless, this court has said, as are the possibilities of need of its activity to direct and control trial courts to the end that justice may be done between parties. It is commonly invoked by use of some appropriate writ, this court by such instrumentality taking to itself the situation to be dealt with. But where the situation is here no writ need be used to bring it here, and where the court has been invoked for relief which it cannot grant, it has in many situations power to grant some appropriate relief in place of that asked.

With these observations as to the scope of the power of this court and that of the trial court, we will state our conclusion as to what may legitimately be done, and ought to be done, in the situation before us.

The appeal to this court was made promptly after the judgment was rendered. A *supersedeas* bond was given and the

trial court ousted of jurisdiction to do anything in the case pending the appeal.   There has been no time since a few days after the judgment was rendered when appellant could have properly moved the court below for relief under sec. 2832. It may be that the *supersedeas* by itself might be held to so interrupt the running of sec. 2832 as to afford opportunity to move under such statute after the suspension of proceedings below shall have ceased.   It should be given such effect, in connection with the power of the circuit court under sec. 2831, that this court under its broad power of judicial administration, in a case under its control, is not without power in sending it back to the trial jurisdiction to do so with authority— in discretion there exercised within a reasonable time after filing the *remittitur* and on motion and such terms as may be thought equitable—to open the way for appellant to interpose an equitable defense as was done in *Wis. M. & F. Ins. Co. Bank v. Mann,* 100 Wis. 596, 76 N. W. 777.   If power exists here to so send the cause back, as we think it does, and otherwise there may not be an opportunity to properly invoke judicial assistance for protection against a result which is highly inequitable, the court ought to use the power.   That would still leave the trial court to pass on the question of whether appellant is not precluded from further use of judicial machinery, by reason of laches, which may be a very difficult question to solve, though it would seem that great significance would be due to the fact that such laches as there was grew out of the judgment of counsel which this court has not been able, by a majority decision, to condemn.

SIEBECKER and KERWIN, JJ.   We concur in the foregoing opinion by Mr. Justice MARSHALL.

The following opinion was filed December 5, 1910:

BARNES, J.   The members of the court who have reached the conclusion that the judgment should be reversed having

set forth their views, I deem it appropriate to add something to what is said in the opinion of the court originally filed, on an aspect of the case not there treated.

Whether the decisions of this court are in harmony or not, as to when an ambiguity should be found to exist in a written contract, is not very material. Those who have occasion to study the cases will form their own conclusions, and judicial assertion of harmony or of lack of it is inconclusive and wholly immaterial.

Before passing from the subject I desire to call attention to the sixth paragraph of the opinion of Mr. Justice MARSHALL. In short, that paragraph means that if a contract is unreasonable it is ambiguous, and the court will proceed to fit the language used to its idea of what the contract should have been. There is some advantage in adopting this method for construing contracts, because the courts have the benefit of hindsight, while the parties must content themselves with using foresight. The main trouble with judicial action of this kind is that it is liable to lead the courts into making contracts for parties which they never contemplated. Such supervisory action might well be more intolerable than the injustice that will sometimes result from a party making an improvident contract, which he can always have reformed in a court of equity for fraud or mutual mistake, if he is able to establish either to the satisfaction of the court. If the minds of the parties do not meet on the contract as written, there may be a rescission, if timely steps are taken to rescind and the parties can be placed *in statu quo*. *De Vain v. De Voin,* 76 Wis. 66, 44 N. W. 839; *Meinecke v. Sweet,* 106 Wis. 21, 24, 81 N. W. 986; *Zoerb v. Paetz,* 137 Wis. 59, 64, 117 N. W. 793. In one sense it is unfortunate that we cannot always decide cases in accordance with the equities of a particular case. But the rules of law must be as fixed and definite as is reasonably possible in order that men may know what the law is and govern themselves accordingly in their actions and in the conduct of their affairs. So, as there must be a choice of meth-

ods, the occasional injustice that will result from an observance of fixed rules of law is preferable to the chaos that would result if mankind had no guide to tie to and the law pertaining to a given transaction could not be known until a court passed upon the equities between the parties.

The opinion first filed proceeds upon the ground that there was no ambiguity in the language of the written contracts, either in a literal sense or when applied to the subject thereof. If we interpret those contracts in view of all the testimony in the case and after considering every fact and circumstance shown by the evidence, I think the result must be the same, because it cannot be said that the parties ever contemplated a sale of less than twenty-five shares of the capital stock of the company. The August contract provides for a sale of twenty-five of the then outstanding five hundred shares of the capital stock of the corporation. The December contract called for a sale of twenty-five shares of the capital stock of the company outstanding when the August contract was made. Those twenty-five shares were delivered to the defendant. The final contract, though dated December 1st, was not in fact made until the following January. The surrender of the 174 shares of stock was made in the preceding October. The book entries in reference thereto were made in November. The plaintiff held these twenty-five shares of stock as collateral for more than five years. There is nothing in the evidence from which it can be assumed that *Mengelberg* ever intended to take or accept less than twenty-five shares of the stock. He had the right to insist on it, but not to insist on paying only the price which he did for it. If there is anything in practical construction, then the parties here have placed an intensely practical construction on their agreements in this case, by the one delivering and the other accepting and paying for the property described in the contract, by the vendor receiving back the stock sold as collateral security for its purchase price and by his retaining it for five years.

It may be true that if *Mengelberg* had insisted when the

December contract was made that all he would invest in the
stock was $25,000, and *Zohrlaut* fully understood the amount
the stock had been appreciated in value by the surrender of
the Herman Zohrlaut stock, he would not have agreed to a
sale of twenty-five shares of his stock at par.  But the fact
remains that twenty-five shares of stock were bargained for in
August and twenty-five shares were sold and delivered, and
that such shares were twenty-five of the five hundred shares
outstanding in August.  If we disregard *Mr. Zohrlaut's* tes-
timony, the inference is strong that the mistake made by him
was not in selling and delivering the twenty-five shares he had
contracted to sell and deliver, but in overlooking an important
fact in fixing the price of what he parted with.  If this be
true, no relief can be granted in this action.  The contract
fixed the method of determining the price at which the stock
was to be repurchased.  We cannot change the contract by
reducing the book value of the stock on December 31, 1904,
because the defendant purchased it too cheaply in December,
1899.

Aside from what has been said, I think an examination of
the record in this case well nigh demonstrates that the minds
of the parties never met on any contract whereby the defend-
ant was to receive less than twenty-five shares of the capital
stock of the corporation as it existed when the stock was de-
livered.  The case was tried before a referee, and, as is usual
in such cases, no very close line was drawn on the admission
of evidence.  The plaintiff was examined under sec. 4096,
Stats. (1898), under sec. 4068, Stats. (1898), and was ex-
amined as a witness in his own behalf and cross-examined at
length in reference to the transactions involved in the case.
He nowhere intimates or says that he sold or intended to sell
anything other than twenty-five shares of the capital stock of
the corporation as it stood on November 30, 1899.  What
he does say is very different.  He testifies that he had no par-
ticular knowledge of the condition of the business when the

contracts with the defendant were made; that he did not know whether the corporation was solvent or insolvent; that he talked with *Mengelberg* about the conditions of the business, and that the latter, "after examining the books and the business thoroughly, came to the conclusion that the stock was worth about par, and we settled it that way." In other words, as it appears from the above testimony, and elsewhere, he practically allowed *Mr. Mengelberg* to fix the price of the stock; and he testifies that he knew the stock of Mr. Herman Zohrlaut, his father, had been surrendered and canceled in the preceding October.

Furthermore, that keen, resourceful, and able lawyer, Mr. Charles Quarles, who tried the case for the plaintiff, did not seem to be able to satisfy himself that, where a man had agreed to sell twenty-five shares of the stock of a corporation and had in fact transferred and delivered it and received his pay therefor and retained the pay and permitted the transaction to stand for five years, he had in fact only sold sixteen and three-tenths shares. In opening his case he stated that the theory of the plaintiff was that from December 1, 1899, on a statement which *Mengelberg* had made up, it appeared that the stock of the corporation was in fact worth par, and that on January 1, 1905, the same was true, and that in determining these facts all of the books of the corporation should be considered and taken into account and not simply those that had been manipulated by the defendant. The statement of Mr. Quarles as to his theory of the case is preserved in the record, and there is no suggestion in it that he considered the contract as being susceptible of a construction that some fractional interest in the corporation was intended to be sold rather than the twenty-five shares of stock specified therein. Of course *Mr. Mengelberg's* testimony negatives any idea that any other or different interest was sold than twenty-five shares of the capital stock of the corporation as of November 30, 1899. So I think it clearly appears from their

own mouths that neither of the parties intended to write any such provision in their contract as it is attempted to insert therein by means of construction resorted to to meet the hardships of the case.

Whether the contract be treated as ambiguous or unambiguous, I think there is nothing in the record which shows any intention on the part of the plaintiff to sell or the defendant to buy less than twenty-five shares of the corporation stock, and that to construe the contract otherwise would amount to making an agreement between the parties on which their minds never met.

This court exercised and could exercise only its appellate jurisdiction in this case. In the exercise of that jurisdiction it reverses judgments only for error, and no error having been discovered the judgment should be affirmed as a matter of course. As to what rights the plaintiff may have in the trial court after the record is remanded, I do not desire to express any opinion, because that question is not before this court.

I am authorized by the Chief Justice and by Mr. Justice VINJE to say that they concur in this opinion.

On December 14, 1910, the appellant moved that the court "(1) grant a rehearing on the question as to what the writings mean; (2) modify the mandate (a) by reversing the judgment and directing a new trial, (b) or in case both motions be denied, then that it be modified by adding thereto permission to the circuit court to entertain a motion to set aside the judgment and for leave to amend the reply to the counterclaim."

The motion was denied January 31, 1911.