Richard V. BRUNS, Ernest E. Bruns, and Sherman Plaza, Inc., a Wisconsin corporation, Plaintiffs-Appellants,

v.

RENNEBOHM DRUG STORES, INC., Walgreen Janesville, Inc., n/k/a Rennebohm Drug Stores, Incorporated, and Walgreen Co., Defendants-Third Party Plaintiffs-Respondents, †

v.

John L. SONDEREGGER, and The Oscar Rennebohm Foundation, Inc., Third Party Defendants-Respondents.

Court of Appeals

*No. 87-2362. Argued November 17, 1988.—Decided May 25, 1989.*

(Also reported in 442 N.W.2d 591.)

† Petition to review denied.

For the plaintiffs-appellants there were briefs by *James R. Cole* and *Haight & Hofeldt,* of Madison, and oral argument by *James R. Cole.*

For the defendants-third party plaintiffs-respondents there was a brief by *David J. Hanson, Thomas E. Klancnik* and *James H. Bowhay,* and *Michael, Best & Friedrich,* of Madison, and oral argument by *David J. Hanson.*

Before Gartzke, P.J., Dykman and Sundby, JJ.

SUNDBY, J. In this appeal we construe a Stock Alienation Restriction Agreement[1] between shareholders

---

[1]The agreement provided:

This agreement entered into by and between all of the present stockholders of Sherman Plaza, Inc., hereinafter referred to as *Parties,* for the purpose of insuring acceptance and approval of stockholders by the owners of a majority of the stock, and in consideration of the mutual covenants and promises said Parties agree as follows:

1. That in the event any of the present or future stockholders of Sherman Plaza, Inc. for any reason whatsoever determines to sell a part or all of the shares which he may own, notice in writing of such intent to sell shall be communicated to all the remaining stockholders specifying the name of the party to whom sale is to be made and the terms and conditions of said sale including price, not less than 30 days nor more than 90 days before the sale is to be consummated.

of Sherman Plaza, Inc. The corporation, and shareholders Richard Bruns and Ernest Bruns, appeal from an order and judgment determining that the Agreement does not apply to the transfer of stock in Sherman Plaza which occurred in the merger of Rennebohm Drug Stores, Inc. and Walgreen Janesville, Inc. We conclude that the Agreement does apply and reverse the judgment.

2. Upon receiving such notice stockholders shall meet 10 days or more prior to the date set for consummation of the sale and by a majority vote shall determine approval or disapproval of the sale based on such factors as they alone according to their sole discretion, shall deem to be pertinent and upon such vote being taken the results of same shall be communicated to the selling stockholder; if the vote be favorable the sale shall be so consummated, but if unfavorable, the sale shall not be consummated nor can the shares be legally transferred on the corporate books, and the board of directors shall then have 60 days within which to have the corporation purchase the stock or find another purchaser acceptable to the stockholders on the same terms and conditions for which the stockholders sought approval, failing which in both alternatives, the stockholders shall be allowed to proceed with the sale at the expiration of the 60th day following the day on which the sale was to be originally consummated.

3. These alienation restrictions do not apply to a sale and transfer of stock as among the present stockholders solely, nor to a sale to the wives of stockholders or to trusts established by stockholders for members of their immediate families.

4. In the event of an attempted transfer of any shares of stock of the corporation in violation of the terms of this agreement, any other stockholder may enjoin such attempted transfer by an action in any court of record in Dane County, Wisconsin, and he may recover as liquidated damages the sum of $1,000 and his reasonable expense of such an action including reasonable attorney's fees as well as disbursements for each violation or attempted violation.

5. This agreement shall be binding upon any transferee or assignee of any shares of said stock, including among others those mentioned in paragraph 3, ante, and upon the heirs, personal representatives, beneficiaries of the will and any assignees by operation of law of every stockholder.

■■■■■■■■■■■■

## I.

Sherman Plaza, Inc., is a close corporation which was formed in 1960 to develop the Sherman Plaza Shopping Center.[2] Fifty percent of the stock was owned by Richard and Ernest Bruns (Bruns) and fifty percent by the Oscar Rennebohm Foundation, Inc., and persons associated with Rennebohm Drug Stores, Inc. (Old Rennebohm's). The foundation transferred fifty shares of stock to an individual and two hundred shares to Old Rennebohm's. These transfers and all other transfers prior to the merger were approved by the Sherman Plaza shareholders and the stock was transferred on the books of Sherman Plaza. The parties stipulated that until the merger there were always two groups of shareholders, the Bruns group and the Rennebohm group.

On April 24, 1980, Old Rennebohm's merged with Walgreen Janesville, Inc., a wholly-owned subsidiary of Walgreen Co., (Walgreen) and Walgreen Janesville was renamed Rennebohm Drug Stores, Incorporated. John Sonderegger, the executive officer of Old Rennebohm's, negotiated the merger for Old Rennebohm's.

Walgreen's first proposal to Old Rennebohm's was a cash proposal. For tax reasons, Sonderegger rejected that proposal. The accepted offer gave the Old Rennebohm's shareholders the option to receive cash or Walgreen stock in exchange for their stock. The Oscar Rennebohm Foundation elected to receive cash for its 15.83% of Old Rennebohm's stock. All other shareholders elected to exchange their stock for Walgreen's stock.

---

[2]A close corporation is frequently defined as a corporation which has relatively few shareholders. F.H. O'Neal & R.B. Thompson, *O'Neal's Close Corporations,* sec. 1.02 (3rd ed. 1986). For a discussion of the normal attributes of a close corporation, *see id.,* sec. 1.07.

On October 3, 1984, Richard Bruns, on behalf of Sherman Plaza, made a written offer to purchase the Sherman Plaza stock which had been transferred to Walgreen as an asset of Old Rennebohm's. Walgreen rejected the offer. This action followed.

## II.

Walgreen contends that the Stock Alienation Restriction Agreement does not apply to the transfer of the Sherman Plaza stock which was accomplished in the merger of Old Rennebohm's and Walgreen Janesville. Walgreen argues that the transfer occurred by operation of law and not by a sale and purchase.

The construction of a contract poses only a question of law, so that this court may construe a contract independent of the trial court's construction. *Zweck v. D P Way Corp.*, 70 Wis. 2d 426, 435–36, 234 N.W.2d 921, 926 (1975). "So far as reasonably practicable it [a contract] should be given a construction which will make it a rational business instrument and will effectuate what appears to have been the intention of the parties." *Bitker & Gerner Co. v. Green Investment Co.*, 273 Wis. 116, 120, 76 N.W.2d 549, 552 (1956) (quoting *Waldo Bros. Co. v. Platt Contracting Co.*, 25 N.E.2d 770, 773 (Mass. 1940)) (brackets added in *Bitker*).

The intention of the parties to the Stock Alienation Restriction Agreement is made clear by the language and nature of the Agreement. We need not, therefore, resort to extrinsic evidence to determine the intention of the parties. *See Northwest Sand & Gravel Co. v. Schlieper*, 17 Wis. 2d 639, 643, 117 N.W.2d 588, 590–91 (1962)

(extrinsic evidence may be resorted to if necessary to determine true meaning of ambiguous instrument).

The preamble to the Agreement states that "[t]his agreement [is] entered into . . . for the purpose of insuring acceptance and approval of stockholders by the owners of a majority of the stock . . .." We may also learn the intention of the parties from the nature of the Agreement.

Restrictions on the transfer of corporate stock are very common. Restatement (Second) of Property (Donative Transfers) sec. 4.4, Reporter's Note 8., at 227 (1983). One authority estimates that the shares of stock of at least half the corporations in the country are subject to such restrictions. *Id.* That figure may be considerably higher in view of the extensive use of the close corporation form of business organization. It is estimated that ninety-five percent of all corporations have ten or fewer shareholders. O'Neal & Thompson, *supra* sec. 1.02 n. 10.

The reasons why stock transfer restrictions may be needed in close corporations are enumerated in O'Neal & Thompson, *supra* sec. 7.02. The paramount reason is implied in the preamble to the Stock Alienation Restriction Agreement—to insure that the "harmony and balance" of the business organization will not be disturbed by the unwelcome intrusion of strangers. O'Neal & Thompson, *supra* sec. 1.07.[3] The Wisconsin Supreme Court has held that this reason supports transfer restric-

---

[3] Another pertinent reason is the close corporation's ability to elect subchapter S status under the Internal Revenue Code. Subchapter S status is not available to a corporation with a corporate shareholder. Although a minority shareholder, Walgreen's mere presence in the corporation will frustrate Sherman Plaza's apparent desire to elect subchapter S status.

tions on stock. In *Casper v. Kalt-Zimmers Mfg. Co.,* 159 Wis. 517, 522, 149 N.W. 754, 756 (1915), the court said:

> The personal element is as important in the make-up and management of a corporation as it is in almost every other undertaking. Restrictions, therefore, reasonably protecting incorporators or stockholders in their interests by permitting them first to purchase stock offered for sale, should be held lawful as promotive of good management and sound business enterprise.

Business participants forming a close corporation not uncommonly consider themselves as partners. O'Neal & Thompson, *supra* sec. 1.07.

The result of the transfer of the Sherman Plaza stock to Walgreen will bring a stranger into Sherman Plaza's corporate fold, a result not intended by the parties to the Stock Alienation Restriction Agreement and a result plainly contrary to the purpose of such agreements generally. Walgreen does not dispute that the Sherman Plaza stockholders intended to retain control over the membership of the corporate family, but it argues that to give effect to that intent would be to rewrite the contract, which is beyond the power of a court. *In re Marriage of Levy v. Levy,* 130 Wis. 2d 523, 533, 388 N.W.2d 170, 174-75 (1986). It claims that the Agreement is limited to sales of stock and that a merger is not a sale but a transfer of assets by operation of law under sec. 180.62 to 180.67, Stats. The Brunses respond that it is the substance of the transaction, not the form, that controls, and that, by the merger, Old Rennebohm's sold its Sherman Plaza stock to Walgreen. Walgreen rejoins that any attempt to extend the Agreement by implication must fail because the Agreement is a restriction on the alienation of property, which must be strictly construed. *See*

*Frandsen v. Jensen-Sundquist Agency, Inc.,* 802 F.2d 941, 946 (7th Cir. 1986) (the rule that rights of first refusal to purchase stock are to be strictly construed is well established in Wisconsin).

A.

First, we do not consider that the Stock Alienation Restriction Agreement needs to be rewritten to effect the intention of the parties. The Agreement imposes obligations upon any Sherman Plaza shareholder who proposes to sell the stockholder's shares. We agree with the Brunses that substance controls over form and that when Old Rennebohm's merged with Walgreen Janesville, it sold its Sherman Plaza stock to Walgreen.

Walgreen argues that in the area of corporate law form and formalities are important, "as they are the method by which sophisticated businessmen make their contractual rights definite and limit the authority of the courts to redo their deal." *Frandsen,* 802 F.2d at 947. Old Rennebohm's and Walgreen were legally entitled to make contractual rights *between themselves* definite by their Agreement and Plan of Merger. They could not, however, in the process, relieve Old Rennebohm's of its obligations under the Stock Alienation Restriction Agreement.

The fact that Walgreen paid for most of the assets of Old Rennebohm's with shares of its stock, does not alter the nature of the transaction as a sale. In *Topzant v. Koshe,* 242 Wis. 585, 9 N.W.2d 136 (1943), an action in which stock was given in part payment for real estate, the court said:

> It is not necessary in order to constitute a sale that the price be in money but if the property is sold for a fixed money price, whether paid in cash or in

goods, it is a sale. 23 R.C.L. p. 1186, sec. 2; 55 C.J. p. 36, sec. 1, and cases cited.

A sale has been defined as "the exchange of an interest in real or personal property for money or its equivalent." *Mansfield v. District Agricultural Asso. No. 6* (1908), 154 Cal. 145, 147, 97 Pac. 150.

The feature which distinguishes an exchange of goods from a sale is that in the one instance a price is fixed in money, and in the other there is a mere exchange of property and goods without a price being fixed.

*Id.* at 589–90, 9 N.W.2d at 138.

The shareholders of Old Rennebohm's received value for the Sherman Plaza stock asset. The value of Old Rennebohm's stock was determined by the Auditor's Report submitted to Walgreen by Old Rennebohm's accountants, pursuant to sec. 10.3(7) of the merger agreement. The Auditor's Report covered not only the fairness of Old Rennebohm's July 31, 1979 balance sheet, which listed the cash and equity value of the Sherman Plaza stock, but also set forth in detail the components of each item appearing in the balance sheet and the basis upon which the value of each component was calculated or determined by the accountants. Walgreen asserts that the value of any individual asset of Old Rennebohm's was never discussed in the merger. It is undisputed, however, that the value of Old Rennebohm's as a going concern was determined from the aggregate of its assets and liabilities, including the Sherman Plaza stock. We do not believe it can be seriously argued, therefore, that Walgreen paid nothing for the Sherman Plaza stock. In the instant case a price was fixed—approximately $6.8 million—for Old Rennebohm's assets, and the Auditor's Report showed the Sherman

Plaza stock at its cost value of $24,000 and equity in book value of $80,000. We conclude that all the elements of a sale were present.

## B.

Second, a right of first refusal or first purchase is not a restraint on the alienation of property if its terms are reasonable as to price and time. Restatement (Second) of Property (Donative Transfers) sec. 4.4. A reasonable right of first refusal does not reduce the opportunity to sell; in fact, it provides a possible buyer who is constantly available. *Id.*, comment a.

There is no logical reason to treat a right of first refusal or first purchase of stock in a close corporation as a restraint on alienation. No public policy is served. To the contrary, close corporations have a special need to control the number and character of shareholders. In recent years, many courts have shown a greater readiness to treat close corporations differently from public-issue corporations. O'Neal & Thompson, *supra* sec. 1.20. One court has stated that "there has been a definite, albeit inarticulate, trend toward eventual judicial treatment of the close corporation as *sui generis.*" *Galler v. Galler,* 203 N.E.2d 577, 584 (Ill. 1964). In an earlier Wisconsin decision, the court considered that the issuance of stock for materially less than its value was stronger evidence of an oppressive scheme against minority shareholders in a close corporation than it would have been in a publicly held corporation. *Steven v. Hale-Haas Corp.,* 249 Wis. 205, 227–28, 23 N.W.2d 620, 631 (1946).

Courts are beginning to support the proposition that the state has little interest in refusing to enforce

agreements among shareholders in close corporations. H. Johnson, *The Texas Close Corporation Law: Some Observations and Modest Proposals*, 15 Tex. Tech L. Rev. 779, 799–800 (1984) (citing *Cressy v. Shannon Continental Corp.*, 378 N.E.2d 941, 945 (Ind. App. 1978); *Hallahan v. Haltom Corp.*, 385 N.E.2d 1033, 1034 (Mass. App. Ct. 1979); *Nash v. Craigco, Inc.*, 585 P.2d 775, 776 (Utah 1978)). *See also* R.E. Ginsberg, *The Need for Special Close Corporation Legislation in Illinois*, 25 De Paul L. Rev. 1, 33 (1975) ("While the state might have some perceived interest in maintaining free alienability as an inherent feature of securities to insure orderly functioning of capital markets, and protection of outside public security holders, it has no such identifiable interest in the context of the close corporation").

We consider that the rule of strict construction of a share transfer agreement between shareholders in a close corporation is anachronistic. We agree with the following:

> The rule of strict construction of share transfer agreements appears to be a function of the former disfavored status of arrangements inhibiting the free transfer of stock. But common law and statutory developments indicate that such agreements are no longer disreputable. On the contrary, the statutory trend demonstrates that share transfer restrictions are highly favored. With this change in attitude, the doctrine of strict construction should be abandoned and share transfer agreements should be generously construed in the light of their intended purpose.

E.J. Bradley, *Stock Transfer Restrictions and Buy-Sell Agreements*, 1969 U. Ill. L. F. 139, 174 (footnote omitted).

100

Wisconsin has adopted a statute to accommodate the special needs of closely held corporations. Sec. 180.995, Stats., 1983 Wis. Act 340, sec. 3. Section 180.995(3) imposes restrictions on the transfer of shares, subject to the articles of incorporation or an agreement of the shareholders, sec. 180.995(12).

Moreover, it would be inappropriate to strictly construe the Stock Alienation Restriction Agreement. The Agreement reveals the intention of the parties. Their intention can be carried out "without doing violence to the rules of language or the rules of law." *Zohrlaut v. Mengelberg,* 144 Wis. 564, 576, 124 N.W. 247, 252, *aff'd.* 144 Wis. 580, 128 N.W. 975 (1910) (quoting *Braun v. Wis. R. Co.,* 92 Wis. 245, 248, 66 N.W. 196, 197 (1896)). There is, therefore, no occasion for applying to the contract a rule of construction whose purpose is to resolve doubts as to the meaning of an ambiguous contract. *See Marion v. Orson's Camera Centers, Inc.,* 29 Wis. 2d 339, 343, 138 N.W.2d 733, 736 (1966) (where stock certificate endorsement was unambiguous, there was no occasion to interpret language against drafter). Even where there is ambiguous language in a contract, rules of construction or interpretation must give way to the basic rule of construction that a contract is to be construed as a whole to carry out the true intent of the parties. *Estate of Schmitz,* 17 Wis. 2d 412, 420, 117 N.W.2d 249, 254 (1962). In *Mathews v. United States,* 226 F. Supp. 1003, 1007 (E.D.N.Y. 1964), the court refused to apply a narrow construction to shareholders' right-to-purchase agreements because such "interpretation" would subvert the manifest objectives of the agreement.

For these reasons, we reject Walgreen's contention that the Stock Alienation Restriction Agreement must be strictly construed.

## C.

Walgreen's transfer-by-operation-of-law argument overlooks the fact that Old Rennebohm's obligation under the Stock Alienation Restriction Agreement arose long before the merger was accomplished. Under sec. 1 of the Stock Alienation Restriction Agreement, when Old Rennebohm's decided to sell its Sherman Plaza stock, it was required to give notice in writing of such intent to all the remaining stockholders who could then approve or disapprove the sale and provide for the purchase of the stockholder's stock by the board of directors or some other purchaser acceptable to the stockholders. Walgreen's first proposal to Old Rennebohm's was a cash proposal. Sonderegger, however, advised Walgreen's that if it was interested in a merger for stock "I'll talk to you." Old Rennebohm's obligation under the Stock Alienation Restriction Agreement probably arose when it agreed to a merger for stock. Certainly it arose on December 21, 1979, when Old Rennebohm's entered into the Agreement and Plan of Merger. The subsequent merger under secs. 180.62 to 180.67, Stats., could not wipe out Old Rennebohm's obligation under the Stock Alienation Restriction Agreement. Walgreen became responsible to discharge that obligation when the merger was completed. Sec. 180.67(5).[4]

---

[4]We note that sec. 5 of the Stock Alienation Restriction Agreement provides that the Agreement is binding on "any assignee[ ] *by operation of law* of every stock holder." (Emphasis added.) Because the parties have not argued or briefed the application of this provision to the merger, we do not address the issue.

## III.

Walgreen argues that equitable considerations require that there be no departure from the rule of strict construction. Because we have concluded that the rule of strict construction is inapplicable, we need not address Walgreen's argument.[5]

*By the Court.*—Order and judgment reversed.

GARTZKE, P.J. *(dissenting).* Restrictions on a stockholder's right to dispose of shares are generally strictly construed. *See Rench v. Leihser,* 487 N.E.2d 1201, 1203 (Ill. App. 1986); *Louisiana Weekly Publishing Co. v. First Nat'l Bank of Commerce,* 483 So. 2d 929, 932–33 (La. 1986); *Durkee v. Durkee-Mower, Inc.,* 428 N.E.2d 139, 141 (Mass. 1981); *Castonguay v. Castonguay,* 306 N.W.2d 143, 145 (Minn. 1981); *Rockowitz v. Roab,* 132 A.D.2d 916, 918, 518 N.Y.S.2d 251, 253 (N.Y. App. 1987); *Avrett & Ledbetter Roofing & Heating Co. v. Phillips,* 354 S.E.2d 321, 323 (N.C. Appp. 1987); and *Renberg v. Zarrow,* 667 P.2d 465, 469–70 (Okla. 1983).[1]

This rule of construction is the result of "a presumption that shares, as a form of property, ought to be freely alienable." T. Andre, *Restrictions on the Transfer of Shares: A Search for a Public Policy,* 53 Tul. L. Rev. 776, 823 (1979). Imposition of restrictions on the transferability of stock complicates and increases the cost of

---

[5] The trial court did not consider these equitable considerations in reaching its decision. The dissent's reliance on the trial court's allusions in dicta to such considerations is, therefore, misplaced.

---

[1] *But see Sorlie v. Ness,* 323 N.W.2d 841, 845 (N.D. 1982) (strict construction should not be applied to defeat intent of restriction on transfer of "close corporation" stock).

such transfers. *Frandsen v. Jensen-Sundquist Agency, Inc.*, 802 F.2d 941, 946 (7th Cir. 1986). The increased costs are not limited to those who draft or consent to such restrictions, but are borne in part by those who must ascertain the meaning and effect of the restriction, such as the court system and potential stock transferees. *Id.*

The stock alienation restriction agreement between the Sherman Plaza shareholders refers only to "sale." It should not be read to include merger. A transfer by merger is accomplished by operation of law. *Schweiner v. Hartford Accident & Indemnity Co.*, 120 Wis. 2d 344, 349, 354 N.W.2d 767, 770 (Ct. App. 1984); sec. 180.62, Stats. "[R]estrictive provisions must clearly indicate that the restraints apply (if they are intended to do so) to . . . transfers by operation of law . . .." F. O'Neal & R. Thompson, *Close Corporations* sec. 7.21, at 100 (3d ed. 1988) (footnotes omitted). This agreement makes no reference to merger or other transfer by operation of law.

A different understanding may have existed between the original shareholders, but the trial court displayed considerable skepticism that this could be true. The court noted that the record supports the inference that the plaintiffs' objection to Walgreen's acquisition "was an afterthought generated by the creation of new tax advantages for plaintiffs some years after the merger occurred." The court also noted that the plaintiffs recognized Walgreen as Rennebohm's successor at annual stockholder meetings, made no reference to the merger at their own shareholder meetings from 1980 through 1985, and voiced no objection to the merger until they learned of the change in tax law.

If the intent of the original shareholders was that the agreement cover mergers, the agreement does not express it. I therefore would affirm.