1999 SD 57

The ESTATE OF Fredris J. ELLIOTT, deceased, by and through its Executor, Raymond D. ELLIOTT Plaintiff and Appellant,

v.

A & B WELDING SUPPLY COMPANY, INC., a South Dakota Corporation, Dakota Welding Supply Company, Inc., a South Dakota Corporation, Donald W. Elliott, an individual, and Robert P. Elliott, an individual, Defendants and Appellees.

No. 20601.

Supreme Court of South Dakota.

Argued Jan. 14, 1999.

Decided May 12, 1999.

Michael P. Reynolds of Quinn, Eiesland, Day & Barker, Rapid City, South Dakota, Attorneys for plaintiff appellant.

William A. May of Costello, Porter, Hill, Heisterkamp & Bushnell, Rapid City, South Dakota, Attorneys for defendants and appellees A & B Welding and Donald W. Elliott.

Tim Shattuck of Woods, Fuller, Shultz & Smith, Sioux Falls, Attorneys for defendants and appellees Dakota Welding and Robert P. Elliott.

MARTIN, Circuit Judge.

[¶ 1.] Estate of Fredris J. Elliott, by and through its executor, Raymond D. Elliott (Estate), appeals summary judgment in favor of A & B Welding Supply Company, Inc. (A & B Welding), Dakota Welding Supply Company, Inc. (Dakota Welding), Donald W. Elliott, and Robert P. Elliott (collectively, Defendants) regarding agreements among shareholders for the purchase of stock. We affirm summary judgment regarding A & B Welding and reverse regarding all other defendants.

## FACTS

[¶ 2.] Fredris J. Elliott died January 22, 1993 at age 81. She was predeceased by her husband, Harold Elliott, who died in the 1972 Rapid City flood. Four sons, Robert, Donald, Raymond and Jack, survived both parents.

[¶ 3.] In the 1960's, Harold, a dominant person who controlled his family and the family businesses, established A & B Welding in Rapid City, and purchased Dakota Welding. Fredris, Donald and Robert were shareholders of both businesses. After her husband's death, Fredris became an active participant in the family's welding businesses and the stockholders' meetings almost up until the time of her death.

[¶ 4.] On January 15, 1973, an "Agreement Among Stockholders To Purchase Stock," regarding A & B Welding was entered into by Fredris, Donald and Robert. Among the provisions was the formula for determining the purchase price of any deceased stockholder's shares, and an instruction that the executor of the estate should sell and promptly transfer the stock title to the company. The document also provided that the majority of shareholders, at any annual meeting or at any other time at a regularly called meeting, may change this price.

[¶ 5.] On January 27, 1973 an "Agreement Among Stockholders To Purchase Stock," regarding Dakota Welding was entered into by Fredris, Robert and Donald. This agreement also contained the formula for determining the purchase price of a deceased stockholder's shares, and an instruction that the executor of the estate should sell and promptly transfer the stock title to the company. The document also provided that the majority of shareholders, at any annual meeting or at any other time at a regularly called meeting, may change this price. The price per share of this stock was changed by agreement in January 1977 to $400.00 per share, and in January 1980 to $639.26 per share.

[¶ 6.] The January 21, 1974 corporate minutes for Dakota Welding reflected that a written buy-sell agreement dated January 27, 1973 with the share value at $300.00 per share was approved. The minutes further provided, "This would be a continued agreement that was lost by Harold P. Elliott in the Rapid City flood." There is no similar entry in the corporate minutes for A & B Welding.

[¶ 7.] Robert testified that to his best knowledge and recollection a buy-sell agreement pertaining to the stock of both

corporations did not exist prior to the death of his father. When asked the same question, Donald answered that he did not know. No such buy-sell agreements have been located; however, Harold's will does provide for the buyout of Harold's stock by Donald and Robert.

[¶ 8.] When deposed on February 4, 1998 and asked about any buy-sell agreement lost in the flood, Donald wasn't sure anything was lost in the flood, and didn't know how that reference got into the minutes.

[¶ 9.] When deposed on April 16, 1998 and asked about any buy-sell agreement and the words in the corporate minutes, Robert stated, "Well, I would take that to be an assumption because I didn't see the Buy and Sell agreement." When asked for an explanation of how this sentence got into the corporate minutes, he answered he supposed "it was quoted by me as trying to justify why I had never seen the Buy and Sell Agreement." Robert further stated there was an *oral* understanding among the shareholders that if one would leave or die, his or her stock would be bought back at the shareholder's initial investment.

[¶ 10.] By affidavit dated May 5, 1998, Robert stated that after Dakota Welding was purchased, and prior to Harold's death, the directors and stockholders entered into an *oral* buy-sell agreement. The agreement was the same as historically done in A & B Welding.

[¶ 11.] By affidavit dated May 6, 1998, Donald stated it was his recollection that prior to Harold's death, "it was *orally* agreed between the stockholders of the corporations that if a stockholder desired to retire, or if a stockholder died, that his stock would be purchased either by the corporation, or the individual shareholders, for the value of the stock as reflected on the corporate books."

[¶ 12.] Estate brought two causes of action based on fraud and deceit. Count I alleged that Fredris was fraudulently and deceitfully induced by Donald and Robert to enter into two buy/sell agreements, executed in January 1973 and ratified in January 1974, and based on their representations that the buy/sell agreements mimicked one entered into by Donald, Robert and Harold prior to Harold's death. Count II alleged that Donald and Robert fraudulently and deceitfully usurped corporate opportunities which negatively affected the value of Fredris' stock for the purposes of a buyout under the terms and conditions of the buy/sell agreements. A third count sought the recovery of punitive damages.

[¶ 13.] Defendants counterclaimed, alleging that the buy/sell agreements constituted valid and enforceable contracts. They requested an order requiring the executor of the Estate to transfer stock at the specified price.

[¶ 14.] In response to a motion by Defendants, the trial court ordered no discovery on Counts II and III, pending a decision on Count I. Thereafter, the trial court granted summary judgment as to all three counts and counterclaims to Defendants. Estate appeals.

## STANDARD OF REVIEW

[¶ 15.] The standard of review applied to the grant or denial of a summary judgment motion in lawsuits involving tort claims is well settled, and again recently stated in *Julson v. Federated Mutual Ins. Co.*, 1997 SD 43, 562 N.W.2d 117:

> Summary judgment is authorized 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law.' SDCL 15-6-56(c). We will affirm only when there are no genuine issues of material fact and the legal questions have been correctly decided. *Bego v. Gordon*, 407 N.W.2d 801, 804 (S.D.1987). All reasonable inferences drawn from the facts must be viewed in favor of the

non-moving party. *Morgan v. Baldwin*, 450 N.W.2d 783, 785 (S.D.1990). The burden is on the moving party to clearly show an absence of any genuine issue of material fact and an entitlement to judgment as a matter of law. *Wilson v. Great N. Ry. Co.*, 83 S.D. 207, 212, 157 N.W.2d 19, 21 (1968).

*Id.* at ¶ 5, 562 N.W.2d at 119.

[¶ 16.] However, proof of a mere possibility is never sufficient to establish a fact. *Hodkinson v. Parker*, 70 S.D. 272, 16 N.W.2d 924, 927 (1944). "When challenging a summary judgment, the nonmoving party 'must substantiate his allegations with sufficient probative evidence that would permit a finding in his favor on more than mere speculation, conjecture, or fantasy.'" *Himrich v. Carpenter*, 1997 SD 116, ¶ 18, 569 N.W.2d 568, 573 (quoting *Moody v. St. Charles County*, 23 F.3d 1410, 1412 (8th Cir.1994)).

[¶ 17.] "Statute of limitations questions are normally for the jury." *Keegan v. First Bank of Sioux Falls*, 519 N.W.2d 607, 611 (S.D.1994). "Further, summary judgment is proper on the issue of statute of limitations only when *application* of the law is in question. Summary judgment is therefore improper where there is a *dispute of material fact* which would affect the application of the statute of limitations." *Id.* (emphasis original).

### DECISION

[¶ 18.] Estate claims Fredris was fraudulently induced into signing the buy/sell agreement of A & B Welding by virtue of the statement contained in the corporate minutes of Dakota Welding, and that there were various meetings among the same participants around the same time. However, there is no probative evidence to substantiate that this statement was repeated to Fredris prior to or at the time of the execution of the A & B Welding buy/sell agreement, thereby allegedly inducing her into signing the same. It is mere speculation and conjecture.

[¶ 19.] "Questions of fraud and deceit are generally questions of fact and as such they are to be determined by a jury; furthermore, whether a party relied on the alleged fraud to its detriment is a fact question for the jury." *Dede v. Rushmore Nat. Life Ins. Co.*, 470 N.W.2d 256, 259 (S.D.1991). However, fraud and dishonesty may never be presumed and left to mere speculation or conjecture. *Roper v. Noel*, 32 S.D. 405, 143 N.W. 130, 132 (1913); *General Finance Corp. v. Fidelity & Cas. Co. of New York*, 439 F.2d 981, 986 (8thCir.1971) (decided under South Dakota law).

[¶ 20.] The summary judgment granted regarding A & B Welding, including its counterclaim, is affirmed.

[7] [¶ 21.] As to all other defendants, there exist genuine issues of material fact, and the reasonable inferences drawn therefrom, which must be decided by a jury. *Bego, supra.* The summary judgment, including the counterclaim, granted to all other defendants is reversed.

[¶ 22.] MILLER, Chief Justice, and KONENKAMP, Justice, concur.

[¶ 23.] AMUNDSON, and GILBERTSON, Justices, dissent.

[¶ 24.] MARTIN, Circuit Judge, for SABERS, Justice, disqualified.

AMUNDSON, Justice (concurring in part, dissenting in part).

[¶ 25.] How can we find that fraud is speculative as to A & B Welding, but not with regard to Dakota Welding? I would hold that we cannot, and would affirm the trial court's decision granting summary judgment.

[¶ 26.] The essential elements of fraud are:

[T]hat a representation was made as a statement of fact, which was untrue and known to be untrue by the party making it, or else recklessly made; that it was made with intent to deceive and for the

purpose of inducing the other party to act upon it; and that he [or she] did in fact rely on it and was induced thereby to act to his [or her] injury or damage. *Stene v. State Farm Mut. Ins. Co.,* 1998 SD 95, ¶ 27, 583 N.W.2d 399, 404; *Dahl v. Sittner,* 474 N.W.2d 897, 900 (S.D.1991); *Holy Cross Parish v. Huether,* 308 N.W.2d 575, 576 (S.D.1981). We have previously stated, " 'allegations of fraud and deceit without specific material facts to substantiate them will not prevent summary judgment.' " *Stene,* 1998 SD 95, ¶ 26, 583 N.W.2d at 404 (quoting *Taggart v. Ford Motor Credit Co.,* 462 N.W.2d 493, 498 (S.D.1990)); *see also Western Cas. & Sur. Co. v. Gridley,* 362 N.W.2d 100, 102 (S.D. 1985).

[¶ 27.] Plaintiff bases allegation of fraud on one statement regarding the buy-sell agreement which states: "This would be a continued agreement that was lost by Harold P. Elliott in the Rapid City flood." This one sentence in the corporate minutes does not rise to the level of establishing fraud. Accepting Plaintiff's argument would require a jury to guess and speculate as to whether Fredris heard this statement prior to entering the agreements, and that she would not have entered the agreements absent the statement. As this Court recently stated, when opposing a motion for summary judgment, the nonmoving party "must substantiate his allegations with 'sufficient probative evidence [that] would permit a finding in [his] favor on more than mere speculation, conjecture, or fantasy.' " *Himrich v. Carpenter,* 1997 SD 116, ¶ 18, 569 N.W.2d 568, 573 (citing *Moody v. St. Charles County,* 23 F.3d 1410, 1412 (8th Cir.1994) (citations omitted)). The plaintiff has failed to substantiate its allegation of fraud with sufficient facts.

[¶ 28.] In *Matter of Estate of Elliott,* 537 N.W.2d 660, 664 (S.D.1995) (*Elliott I* ), we found Fredris to be a person who is very strong willed, and not easily influenced. In *Elliott I,* we accepted testimony from Fredris' long-time friend and neighbor who "described her as a very controlling and manipulative person with a strong will who would distance herself from those she could not control[,]" and that, "Fredris could not be easily influenced." *Id.* at 664. This Court determined that the record reflected, "[S]he ultimately made up her own mind and did whatever she wished." *Id.* at 663. Further, "evidence of Fredris' 'mental strength' and independence was offered by Donald Elliott and by Fredris' attorney, Mr. Thorstenson, both of whom testified Fredris was of sound mind and competent at all relevant times." *Id.* at 665–66. Testimony from Robert Elliott during deposition was that, "his mother knew ever penny she had even up until her death and that she was 'sharp in numbers.' " *Id.* at 666.

[¶ 29.] Here is a person who was clearly found to be in control of her assets and not susceptible to undue influence in *Elliott I,* but now we are to believe she was defrauded.

[¶ 30.] Fredris was an active participant in the family's welding businesses and the stockholders' meetings almost up until her death. *Elliott I,* 537 N.W.2d at 661. The record discloses Fredris was present at the corporate meetings, where they adjusted the valuation of the buy-sell agreement, and at no time expressed displeasure with such valuation. Further, Fredris was aware of the practice of owning cylinders and, in fact, received rental income from the cylinders.

[¶ 31.] As stated above, allegations of fraud are insufficient to withstand a motion of summary judgment, there must be material facts to substantiate such allegations. *Stene,* 1998 SD 95, ¶ 26, 583 N.W.2d at 404. This record is devoid of such facts.

[¶ 32.] Raymond D. Elliott, the executor, testified under oath that he had no problem with the buy-sell agreement contained in the corporate records. Numerous courts have held that buy-sell agreements contained in by-laws, on stock certificates, and made among shareholders are valid

and enforceable, especially in a close corporation.* This witness further testified that his dissatisfaction was with the methodology used in valuing the stock under the buy-sell agreements. This is the first time in twenty years there has been such a claim. It is obvious Fredris did not object to valuation. There has been no showing that the methodology or formula used was fraudulent. Mere dissatisfaction, based on hindsight, does not carry plaintiff's burden to show fraud.

[¶ 33.] The trial court, in granting the summary judgment motion, laid to rest this family war. I would affirm, so that it could remain in such posture.

[¶ 34.] I am authorized to state that Justice GILBERTSON joins in this special writing.

---

* *See Miller Waste Mills, Inc. v. Mackay,* 520 N.W.2d 490, 494 (Minn.Ct.App.1994) (stating, "A corporation's right to repurchase shares upon a shareholder's death is a common transfer restriction that many courts have upheld."); *Dixie Pipe Sales, Inc. v. Perry,* 834 S.W.2d 491, 493–94 (Tex.Ct.App.1992) (upholding a restriction on the transfer of stock in a closely held corporation); *Bruns v. Rennebohm Drug Stores, Inc.,* 151 Wis.2d 88, 442 N.W.2d 591, 595–96 (Wis.Ct.App.1989) (ruling that a right of first purchase of stock in a closed corporation should be enforced); *Sorlie v. Ness,* 323 N.W.2d 841, 844–47 (N.D. 1982) (writing that a first-refusal option, which may be granted to the corporation, to its shareholders, or to both, is universally accepted as legally valid); *F.H.T., Inc. v. Feuerhelm,* 211 Neb. 860, 320 N.W.2d 772, 776–77 (1982) (ruling that a stock transfer restriction requiring shareholders to first offer their shares to the company at book value was valid); *Rowland v. Rowland,* 102 Idaho 534, 633 P.2d 599, 606–07 (1981) (finding reasonable a by-law requiring shareholders to first offer stock to the corporation at book value); *Ginter v. Palmer & Co.,* 39 Colo.App. 221, 566 P.2d 1358, 1360 (1977) (upholding a provision in the articles of incorporation requiring that the corporation have the option to purchase stock at book value upon the death of a shareholder), *rev'd on other grounds, Ginter v. Palmer & Co.,* 585 P.2d 583 (Colo.1978); *In re Estate of Brown,* 130 Ill.App.2d 514, 264 N.E.2d 287, 291 (1970) (enforcing shareholder agreement granting companies first option to purchase stock upon death of shareholder at book value); *Allen v. Biltmore Tissue Corp.,* 2 N.Y.2d 534, 161 N.Y.S.2d 418, 141 N.E.2d 812, 815–16 (1957) (recognizing that courts have uniformly held valid charter and by-law provisions requiring stockholder to first offer stock to corporation and other shareholders).