2002 SD 97

**Jim SCHWAIGER, M.D., Plaintiff and Appellant,**

v.

**MITCHELL RADIOLOGY AS-SOCIATES, P.C., Defendant and Appellee.**

No. 22197.

Supreme Court of South Dakota.

Considered on Briefs May 28, 2002.

Decided Aug. 7, 2002.

Robert A. Christenson, Sioux Falls, Jonathan K. Van Patten, Vermillion, for plaintiff and appellant.

Monte R. Walz of Davenport, Evans, Hurwitz & Smith, Sioux Falls, for defendant and appellee.

AMUNDSON, Justice.

[¶ 1.] Jim Schwaiger (Schwaiger), a radiologist, sued Mitchell Radiology Associates, P.C. (MRA), for misrepresentations that allegedly occurred while MRA was recruiting Schwaiger as an employee. The trial judge granted MRA's motion for summary judgment. Schwaiger appeals. We affirm.

## FACTS

[¶ 2.] This dispute stems from actions that took place prior to Schwaiger's association with MRA. Dr. David Kundel (Kundel) and Dr. Carey Buhler (Buhler), both radiologists, formed MRA. Each owned an equal number of shares in the corporation and had equal ownership and voting rights. In 1994, a disagreement between Buhler and Kundel arose from Kundel's failure to disclose a medical malpractice claim against him to Buhler, which impacted their malpractice insurability. In resolving the dispute, the two signed an agreement stating Buhler would take over most of the management responsibilities of the corporation, and that Kundel would vote for Buhler as president and treasurer as long as Kundel was a director of the corporation. In essence, control of the corporation shifted to Buhler.

[¶ 3.] MRA began hiring additional staff, and Schwaiger responded to a posting for a radiology position. Schwaiger claims that during the initial discussions, Buhler and Kundel commented on the potential for a "partnership" position within a short time after acting as an employee of MRA.[1] Schwaiger came from Texas to Mitchell twice to visit MRA and discuss possible employment. He claims the discussions all indicated that there would be an opportunity to become a "full partner." After initially turning down MRA's offer for employment, Schwaiger later left a position in Texas and called Kundel to see if the job was still open.[2] It was, and the parties again negotiated for Schwaiger's employment at MRA. Based on Schwaiger's desire to become a partner more quickly, the parties agreed that his salary would be reduced in exchange for lessening the amount of time before Schwaiger could be considered for partner from two years to one year.

[¶ 4.] On April 8, 1998, Schwaiger signed a one-year employment contract with MRA, which included the following clause:

---

1. The parties use the terms "partner" and "shareholder" interchangeably.

2. Before Schwaiger turned the offer down, he had written a counter-proposal to MRA. That proposal, stated, in pertinent part, that "at the end of one year" Schwaiger "may be offered an opportunity to buy an equal share of MRA at the sole discretion of MRA. . . ."

18. *Eligibility to Purchase stock:* Following completion of twelve (12) full months of employment, Corporation or its shareholders *shall consider selling to Employee a stock ownership interest in the Corporation.* The Corporation's or shareholders' decision to sell employee an ownership interest requires the unanimous vote of the shareholders on such terms and conditions as are acceptable to the Corporation and shareholders. *Corporation's or shareholders' decision to sell an ownership interest to Employee is wholly within the discretion of the Corporation and shareholders.*

(emphasis added). The contract also contained an integration clause superseding any prior understanding or agreement among the parties involved and a clause permitting termination of Schwaiger's employment at any time, with or without cause, on sixty days notice.

[¶ 5.] At the end of the first year of employment at MRA, Schwaiger was given the following information through a letter from MRA:

This letter is to advise you that we desire to continue your employment under the same terms and provisions of our contract date April 8, 1997, pending a modification of your compensation.

It is our intent to make an offer to you regarding your purchase of ⅓rd of the outstanding shares of common stock in Mitchell Radiology Associate, P.C. Upon agreement of price and terms of payment, which then will provide that your compensation will be that of a ⅓rd owner, subject to the terms and conditions of an employment contract which is in the process of being prepared.

This is our letter of intent to continue our relationship. If the same is agreeable with you, please acknowledge by your signature on the bottom of this letter, where indicated.

Schwaiger did not want to continue his employment without knowing if a stock purchase agreement would be worked out. He was then given a copy of the stock-purchase contract, but decided it was different than Buhler's contract, so he did not sign it.[3] After further bargaining, Schwaiger claims the parties came to an agreement, but then, he alleges, "Buhler accidentally disclosed the existence of this secret agreement." The "secret agreement" Schwaiger was referencing was the voting agreement between Kundel and Buhler from 1994. Therefore, Schwaiger chose not to become a shareholder, and subsequently sued MRA for alleged misrepresentation of his employment.

[¶ 6.] MRA moved for summary judgment, and on October 1, 2001, the circuit court granted that motion. Schwaiger appeals the following issues:

1) **Whether the circuit court erred in granting summary judgment.**

2) **Whether there was a duty to disclose the shareholders' agreement affecting management and voting.**

3) **Whether parol evidence is admissible to prove fraud in the inducement of a contract.**

4) **Whether admissions were made by a corporation shareholder.**

---

**3.** Paragraph 13 of the agreement submitted to Schwaiger provided for the issuance of 20 shares of capital stock under a Buy Sell agreement. The agreement further provided in paragraph 5 that "so long as Employee works substantially the same amount of time as do other Full-time, Regular Professional Employees, the Employee shall be compensated at a salary equal to other Full Time, Regular Professional Employees as determined from time to time by Employer and Employee."

## STANDARD OF REVIEW

[¶ 7.] "When challenging a summary judgment, the nonmoving party 'must substantiate his allegations with sufficient probative evidence that would permit a finding in his favor on more than mere speculation, conjecture, or fantasy.' " *Estate of Elliott ex rel. Elliott v. A & B Welding Supply Co., Inc.*, 1999 SD 57, ¶ 16, 594 N.W.2d 707, 710 (quoting *Himrich v. Carpenter*, 1997 SD 116, ¶ 18, 569 N.W.2d 568, 573) (other citations omitted).

> In reviewing a grant or a denial of summary judgment under SDCL 15–6–56(c), we must determine whether the moving party demonstrated the absence of any genuine issue of material fact and showed entitlement to judgment on the merits as a matter of law. The evidence must be viewed most favorably to the nonmoving party and reasonable doubts should be resolved against the moving party. The nonmoving party, however, must present specific facts showing that a genuine, material issue for trial exists. Our task on appeal is to determine only whether a genuine issue of material fact exists and whether the law was correctly applied. If there exists any basis which supports the ruling of the trial court, affirmance of a summary judgment is proper.

*S.D. State Cement Plant Comm'n v. Wausau Underwriters Ins. Co.*, 2000 SD 116, ¶ 9, 616 N.W.2d 397, 400–01 (quoting *Stoebner v. S.D. Farm Bur. Mut. Ins. Co.*, 1999 SD 106, ¶ 6, 598 N.W.2d 557, 558) (other citations omitted). A material fact is one that would impact the outcome of

the case "under the governing substantive law in that 'a reasonable jury could return a verdict for the nonmoving party.' " *Id.* (citation omitted).

## DECISION

[¶ 8.] **1) Whether the circuit court erred in granting summary judgment.**

[¶ 9.] The trial court held that any of Schwaiger's claims of misrepresentation are contradicted by the subsequent written contract, the contract superceded all prior negotiations, and that to allow plaintiff's claims of fraud or deceit would amount to rewriting the contract. Therefore, summary judgment was granted on his fraud claim.[4]

[¶ 10.] Fraud in the inducement may exist where one party to a contract is unable to "negotiate fair terms and make an informed decision" because he is "undermined by the other party's fraudulent behavior[,]" thereby creating recoverable tort damages. 37 Am.Jur.2d Fraud and Deceit § 279 (2001). This Court has previously cited to two statutes when discussing fraud in the inducement. *Mash v. Cutler*, 488 N.W.2d 642, 652 (S.D.1992). The first, SDCL 20–10–1, states that "[o]ne who willfully deceives another, with intent to induce him to alter his position to his injury or risk, is liable for any damage which he thereby suffers." *Id.* Secondly, SDCL 20–10–2 states that "deceit" under SDCL 20–10–1 is either:

---

4.  MRA argues that fraud stemming from the nondisclosure of the voting agreement was not pled with particularity to the trial court, thereby waiving such claim. We have said, "fraud is sufficiently pled if the pleading party has set out facts indicating that there was a knowing misrepresentation, and that the plaintiff relied upon this falsity." *Tri–State*

*Refining and Inv. Co., Inc. v. Apaloosa Co.*, 431 N.W.2d 311, 314 (S.D.1988). Here, in his complaint, Schwaiger alleged that the agents of MRA made misrepresentations about Schwaiger's ability to become a "full partner" despite their knowledge that stock Schwaiger purchased would be restricted. This is stated with sufficient particularity.

(1) The suggestion, as a fact, of that which is not true, by one who does not believe it to be true;

(2) The assertion, as a fact, of that which is not true, by one who has no reasonable ground for believing it to be true;

(3) The suppression of a fact by one who is bound to disclose it, or who gives information of other facts which are likely to mislead for want of communication of that fact; or

(4) A promise made without any intention of performing.

These statutes "are declaratory of common law and comprehend an intention to mislead." *Mash*, 488 N.W.2d at 652; *Dede v. Rushmore Nat'l Life Ins. Co.*, 470 N.W.2d 256, 259 n. 2 (S.D. 1991).

[¶ 11.] MRA argues that a party cannot claim fraud where the alleged fraudulent misrepresentations are expressly contradicted by the terms of a signed written agreement. We agree that if a written contract is in direct contradiction of an oral representation, reliance on that oral representation, as a matter of law, is unjustified. *Davidson v. Wilson*, 973 F.2d 1391, 1401 (8th Cir.1992) (affirming motion for summary judgment where investors unjustifiably relied on oral representations that were contradicted by written subscription agreement). *See also Calhoun v. Exxon Corp.*, 64 F.3d 656 (4th Cir.1995) (stating that plaintiff failed to state a claim under Federal Rule of Civil Procedure 12(b)(6) where plaintiff allegedly relied on oral representation, which was contradicted in written contract). Before fraud in the inducement can be proven, an employee must show he justifiably relied on representation fraudulently made, or his claim will be unsuccessful. *Houlihan v. Offerman*, 31 F.3d 692, 695–96 (8th Cir.1994). Logically, if the employment contract itself contradicts any alleged oral promises

made, reliance on that oral promise is simply not justified. *Id.See also Slivinsky v. Watkins-Johnson Co.*, 221 Cal.App.3d 799, 270 Cal.Rptr. 585, 589 (1990) (stating reliance on oral promise was unjustified when contradicted by integrated employment agreement). Where inconsistencies exist between an alleged oral promise and the terms of a written agreement, the issue truly boils down to "reasonable reliance on the promise." *Veit v. Anderson*, 428 N.W.2d 429, 432 (Minn.Ct.App.1988) (finding if an oral promise is "explicitly" contradictory to writing, reliance is unjustified as a matter of law; if promise is contradictory in light of other facts, the question is for a trier of fact).

[¶ 12.] In this case, Schwaiger claims to have relied on oral representations that he would become a "full partner" and that Kundel and Buhler's nondisclosure of the voting agreement resulted in fraudulent inducement. These allegations do not rationally square up with the terms of the written employment contract he entered. Schwaiger could have been fired "without cause" upon sixty days' notice under the terms of the contract. Moreover, the stock purchase eligibility under the terms of the contract was certainly no promise of "full partnership rights." Clause 18 of the employment contract Schwaiger signed, as set forth in the facts above, indicates that the Corporation would *"consider"* selling Schwaiger stock ownership interest. This would only occur if there was a unanimous vote of the existing shareholders, and only on terms acceptable to those shareholders. Furthermore, under the terms of the contract, the "decision to sell an ownership interest to Employee is wholly within the discretion of the corporation and shareholders." This is certainly in direct contradiction of the alleged oral promise of "full partnership" rights after one year of employment. We understand that

Schwaiger is not concerned with the ability to purchase stock or enforce the promise supposedly made, but rather focuses on his lack of knowledge regarding the voting agreement. This, however, does not change the fact that the written agreement contradicted the alleged oral promise of becoming a shareholder on equal footing with the existing shareholders.

[¶ 13.] In a factually similar case, a physician entered an employment contract that provided if the physician-employee worked for the employer group for one year, then the parties would negotiate for the employee to have stock-purchasing opportunities. *Kandel v. Center for Urological Treatment and Research, P.C.*, 2002 WL 598567, *1 (Tenn.Ct.App.2002). After the employee worked for one year, the parties negotiated, as agreed, but the negotiations came to an impasse. *Id.* The employee subsequently sued on grounds that the defendants fraudulently induced him to sign the employment agreement and that the employers failed to negotiate

in good faith. More specifically, he "assert[ed] that the defendants induced him into signing the employment contract . . . by promising that he could become a shareholder . . . at the end of his first year of employment," which is also Schwaiger's contention. *See id.* at *3. In that case, the court found that the employment contract only promised good faith negotiations, and that the plaintiff/appellant provided no evidence to show he was fraudulently induced into signing. *Id.* at *8.[5] That is true here as well.[6]

[¶ 14.] Importantly, cases of fraud and deceit require a higher degree of specificity in order to avert summary judgment. *Bruske v. Hille*, 1997 SD 108, ¶ 11, 567 N.W.2d 872, 876 (stating specific material facts must be presented in order to prevent summary judgment on fraud and deceit claims). In this record, there are no specific facts provided by Schwaiger supporting his claim for fraudulent inducement.[7] The evidence shows a breakdown

---

**5.** In another factually similar case where the plaintiff was to become a partner after two years, the court found that any oral promises were barred by the statute of frauds. *Taimoorazy v. Bloomington Anesthesiology Service, Ltd.*, 122 F.Supp.2d 967 (C.D.Ill.2000). Although we find it unnecessary to address the statute of frauds in this case based on our ultimate holding, the *Taimoorazy* Court also points out the importance of focusing on the written contract while discussing promissory estoppel.

**6.** Appellant also raises issue two regarding whether parol evidence is admissible to prove fraud in the inducement of a contract. We find it unnecessary to address this issue considering our decision in issue one.

**7.** In fact, a series of e-mails between Schwaiger and Buhler demonstrates that Schwaiger was unwilling to even discuss information that may have been pertinent to the final negotiations. After Schwaiger hung up on Buhler during a phone conversation regarding Schwaiger's employment, Buhler e-mailed the following message to Schwaiger:

Dear Jim,
I'm confused. I'm getting the impression with you hanging up on me that I've done something to offend you. . . .
I also was surprised to see you have taken most of your things out of the hospital, apparently in the middle of the night.
Since I wasn't able to talk to you, has [Kundel] said something that has you mad? I have not been able to reach [Kundel]. When we talked on Friday, you seemed intent on . . . coming in to work on Monday with a completed partnership employee agreement. I'm not sure why that would be necessary unless you believed that would put the pressure on to more favorably negotiate something. If that were the case, have you discussed whatever it is you're interested in with [Kundel], because I'm not aware what it could be. After I talked to you, I told [Kundel] it didn't sound like you were coming to work Monday if you didn't sign the employee agreement. I told him to call me before leaving town since he may have to be here if you don't come in. I haven't

in contract negotiations because of Schwaiger's own actions after MRA made the offer required in the written contract.

[¶ 15.] Fraudulent inducement requires willful deceit and intent to induce another to alter his position. *Mash,* 488 N.W.2d at 652. This case appears to involve professionals negotiating at arm's length for pay and for stock ownership. During negotiations for the initial agreement, Schwaiger never asked about a voting agreement. Even after discovering the voting agreement at the end of the first year, he never discussed it with Buhler and Kundel. Instead, he chose to walk away, and then file a fraudulent inducement claim based on his dissatisfaction with the outcome of the negotiations. The mere subjective expectation of one professional cannot rise to the level of fraudulent inducement. There are no specific material facts indicating that MRA wrongfully induced Schwaiger to enter the initial employment contract with MRA. The record reflects that he sought to be employed at MRA, and during the initial negotiations, made counter proposals. Most importantly, the only evidence of fraud is Schwaiger's own assertion of his expectations as to what was "equal partnership." These bare allegations of fraud, "without specific material facts to substantiate them will not prevent summary judgment." *Stene v. State Farm Mut. Auto. Ins. Co.,* 1998 SD 95, ¶ 26, 583 N.W.2d 399, 404.[8]

[¶ 16.] **2)** **Whether there was a duty to disclose the shareholders' agreement affecting management and voting.**

[¶ 17.] The trial court held, that as a matter of law, MRA had no duty to disclose information about the voting agreement because the parties were dealing at arm's length and Schwaiger was freely negotiating the terms of his con-

been able to reach him. Have you talked to him or did you agree to cover for him? Although I certainly can't make you respond to me, I hope you can see that I don't know what is going on. If this is the way you deal with your colleagues [sic], then just let me know. Please call me or page me to call you back. . . .

Jim, I have to tell you some things. I truly am saddened, if you are deciding to leave. I enjoy being able to talk to you about difficult cases and value your opinion. I also value your opinion in practice management. You have seen other practice situations and have valuable insite [sic]. I don't like ever having to be a "bad guy", but sometimes it comes with the territory.

Please answer me by e-mail or call me.

Best regards to you,

[Buhler]

Schwaiger responded with the following e-mail:

I do not want you to be confused. I thought I was clear on the phone.

I hung up the phone because there was nothing further to discuss with you. I do not want to be impolite, so please don't call again.

8. The dissent relies on Exhibit H in its contention that there are genuine issues of material fact. Schwaiger's deposition testimony regarding this exhibit indicates that he actively took part in the drafting of Exhibit H. Moreover, it is obvious that this exhibit was compiled after Schwaiger rejected MRA's offer for a one-third interest in the corporate stock—equal ownership. To make this the foundation of this fraudulent inducement claim would be to allow a party to fabricate, after-the-fact, a position that is totally in contradiction with the written contract entered into by the parties. In short, it would require this Court to allow a party to be relieved of his executed, written contract. Most importantly, Exhibit H clearly reflects that Kundel's so-called "admissions" do not relate to any independent evidence of fraud. On the contrary, they only relate to the "promise" and "commitment" the parties discussed in the oral negotiations, which were superseded by the written, signed employment contract that now precludes Schwaiger from claiming that he was fraudulently induced to enter into the employment contract.

tract. Schwaiger, however, argues that MRA had a duty to disclose the agreement between Buhler and Kundel, and cites to the Restatement of Torts, which says that the failure to disclose facts that may justifiably induce another to act in a business transaction may result in liability. Restatement (Second) of Torts § 551 (1976). This, the Restatement states, is true only if the non-disclosing party was "under a duty to the other to exercise reasonable care to disclose the matter in question." *Id.*[9]

[¶ 18.] There is no doubt that when individuals act in certain capacities, duties arise to disclose specific information. *Buxcel v. First Fidelity,* 1999 SD 126, ¶ 14, 601 N.W.2d 593, 596–97 (stating "one who stands in a confidential or fiduciary relation to the other party to a transaction must disclose material facts"); *Greene v. Morgan, Theeler, Cogley & Petersen,* 1998 SD 16, ¶ 26, 575 N.W.2d 457, 462 (stating attorney's failure to disclose that an alimony waiver was invalid may constitute fraudulent concealment); *Glad v. Gunderson, Farrar, Aldrich and DeMersseman,* 378 N.W.2d 680, 683 (S.D.1985) (stating attorney had duty to disclose defects he knew or should have known). Schwaiger

was not in a fiduciary or confidential relationship with MRA. *See Dinsmore v. Piper Jaffray, Inc.,* 1999 SD 56, ¶ 18, 593 N.W.2d 41, 46 (acknowledging real estate brokers and securities brokers owe fiduciary duty to customers and discussing fiduciary relationships).

[¶ 19.] The parties in this case merely had a contractual relationship. *Baker v. Jackson,* 372 N.W.2d 142, 147 (S.D.1985) (abrogated by state statutes on other grounds) (stating "employer-employee relationship arises only out of contract"). Fiduciary duties, which often produce the duty to disclose, "are not inherent in normal arm's-length business relationship, and arise only when one undertakes to act primarily for another's benefit." *Dinsmore,* 1999 SD 56 at ¶ 20, 593 N.W.2d at 47. Such duties will not be implied unless one involved party is unable to protect his own interests, and in turn, places trust and confidence in the other party. *Id.* That was not the case here.

[¶ 20.] Schwaiger clearly negotiated the terms of the contract at arm's length. He admits to visiting MRA twice before even considering an employment contract,

9. Comment k of Restatement (Second) Torts § 551 further states:

> To a considerable extent, sanctioned by the customs and mores of the community, superior information and better business acumen are legitimate advantages, which lead to no liability. The defendant may reasonably expect the plaintiff to make his own investigation, draw his own conclusions and protect himself; and if the plaintiff is indolent, inexperienced or ignorant, or his judgment is bad, or he does not have access to adequate information, the defendant is under no obligation to make good his deficiencies.

*See also, Bradford v. Vento,* 48 S.W.3d 749 (Tex.2001) (citing comment k *supra* approvingly). Moreover, as it pertains to this case, § 551(2)(b) only imposes a duty to disclose when a party makes a "partial or ambigu-

ous" statement of the facts. Here, there was no "partial or ambiguous" statement of the facts. There was no "partial or ambiguous" representation concerning possible ownership interest and control of the corporation because the superseding written agreement expressly permitted an offer of an ownership interest on any terms within the absolute discretion of the shareholders and only upon their unanimous vote. Because the oral negotiations were superseded by this agreement, and because this agreement permitted an offer of virtually any terms, there could be nothing incomplete or ambiguous about the stated offer. Simply stated, the parties written agreement plainly permitted *any* offer of ownership on any terms including equal or *unequal* ownership and control.

and to actively negotiating by writing a counter-proposal to MRA. Then, after initially declining MRA's offer, he approached them about reopening negotiations. He chose to take a lower salary in exchange for lessening the time period before a buy in would be considered. Clearly, Schwaiger was not lacking the ability to protect his own interests; rather, he demonstrated his ability to look out for his best interest.

[¶ 21.] Voting agreements in various forms are common in the corporate realm. O'Neal & Thompson, O'Neal's Close Corp § 5.03 (3rd ed.). In fact, our Legislature has stated "[a]greements among shareholder regarding the voting of their shares shall be valid and enforceable in accordance with their terms." SDCL 47-4-23.1. Therefore, if Schwaiger's foremost goal was to ensure he had the opportunity to buy into the corporation and acquire equal voting rights with all other shareholders, he should have made a more thorough inquiry and clarified what he required for the offer to constitute an "equal partnership." Instead, he signed a contract that did not define "equal partnership" and that failed to require that he have equal voting rights at the end of the first year.

[¶ 22.] For the foregoing reasons, we do not find MRA had a duty to disclose the voting agreement to Schwaiger. Based on our holding it is unnecessary to address other issues raised on appeal.

[¶ 23.] Affirmed.

[¶ 24.] GILBERTSON, Chief Justice and ZINTER, Justice, concur.

[¶ 25.] SABERS and KONENKAMP, Justices, dissent.

SABERS, Justice (dissenting).

[¶ 26.] There are genuine issues of material fact as to fraud in the inducement to get Dr. Schwaiger to move to Mitchell, South Dakota, and agree to take a substantial first year reduction in pay in order to have a good faith opportunity to get equal ownership in 1 year rather than in 2 years.

[¶ 27.] The majority opinion reaches the wrong decision in part because it addresses the issues in absolute backwards order. *See* order of issues in majority opinion at ¶ 6. For example:

(1) If the majority opinion would first decide correctly that after-the-fact admissions by a corporation owner were relevant to prove fraud in the inducement, it would put the entire case in a different light and in fact, change the result.

(2) Likewise, parol evidence is always admissible to prove fraud in the inducement of a contract. *See Ducheneaux v. Miller*, 488 N.W.2d 902 (S.D.1992).

(3) Likewise, in the fraud in the inducement of the contract claim, which goes to good faith, there is a duty to disclose the shareholder's agreement affecting management and voting.

(4) Finally, the circuit court erred in granting summary judgment because genuine issues of material fact as to fraud in the inducement exist.

[¶ 28.] More specifically, the after-the-fact admissions by Dr. Kundel "that [MRA failed] to honor our promise to make him a full partner at the end of his year" ... "as well as a continued violation of the commitment we made more than a year ago with Dr. Schwaiger" is sufficient to prove genuine issues of material fact. *See* the highlighted portions of attached Exhibit H (Crisis in Radiology Memo) to support these and other genuine issues of material fact.

[¶ 29.] Obviously, if Dr. Buhler knew at the time of the contract that he would block the "equal partnership" of an "excellent radiologist" without regard to his performance, it would constitute fraud in the inducement. Although not proven yet, it can be fairly inferred from the evidence and the Crisis in Radiology memo, which present genuine issues of material fact.

[¶ 30.] In summary, it is obvious that one should determine questions of relevant evidence, including parol evidence and legal duty to disclose in a fraud case before determining the ultimate issue: "1) [w]hether the circuit court erred in granting summary judgment."

[¶ 31.] The majority opinion also gets the burden of proof backwards. Under *Dep't of Revenue v. Thiewes,* 448 N.W.2d 1, 2 (S.D.1989), the *moving party* must show that there are no genuine issues of material fact. This it has failed to do. The burden is not upon the *NONmoving party* to show that there are genuine issues of material fact, even though he has.

[¶ 32.] KONENKAMP, Justice, joins this dissent.

Exhibit  H

TO: Carey Buhler M.D.
FROM: David Kundel M.D.

SUBJECT: Crisis in Radiology

I was forced to cancel my MRI conference and vacation in the first of May to cover the hospital after the termination of Dr Schwaiger's contract and Mitchell Radiology's failure to honor our promise to make him a full partner at the end of his year.?

I am appalled that we remain in this unresolved crisis more than a month later. I was hopeful after our meeting in mid May at which all three of us agreed to meet with an independent lawyer to finalize an equal partnership agreement. Since then you have twice refused to honor even this commitment for the three of us to meet together to work out the terms. Instead, you have insisted on the two of us meeting without Dr. Schwaiger to discuss one of us buying out the other. This is a gross violation of our mutual agreement in mid May, as well as a continued violation of the commitment we made more than a year ago with Dr. Schwaiger.

Your offer to sell out your half interest in MRA in return for a 10 year guaranteed job at partnership salary as well as $1 Million in cash is in blatant violation of our buy-sell agreement signed in 1994. In the best of times, this proposal is an outrage. Since MRA is in default of its contract with the hospital, words cannot describe my disgust.

Until this matter is settled, neither of us will take any vacation. One of my few remaining rights as your "equal partner" is to veto any hiring of doctors, temporary or permanent. I will exercise that right until Dr. Schwaiger is made an equal partner as of April 28, as we promised. We will not be hiring temporary radiologists while we have an excellent radiologist and partner sitting unemployed, with the hospital and our patients being underserved.

Of course, we will also not attempt any recruitment of "permanent radiologists" until we have honored our commitment to our partner, Dr. Schwaiger. If you feel differently about this, you need to make your justification to the medical staff, board members and hospital administration. I regret that I am powerless by myself to force you to change your behavior.

David H. Kundel MD

Cc: Dennis Leland M.D., Chief of Medical Staff